ZENITH RADIO CORPORATION

v.

MATSUSHITA ELECTRIC INDUSTRI-
AL CO., LTD. et al.

NATIONAL UNION ELECTRIC
CORPORATION

v.

MATSUSHITA ELECTRIC INDUSTRI-
AL CO., LTD. et al.

In re JAPANESE ELECTRONIC PROD-
UCTS ANTITRUST LITIGATION.

Civ. A. Nos. 74–2451, 74–3247.
MDL No. 189.

United States District Court,
E. D. Pennsylvania.

April 14, 1980.

As Amended April 23 and April 25, 1980.

See also, D.C., 494 F.Supp. 1161.

Blank, Rome, Comisky & McCauley, by Edwin P. Rome, William H. Roberts, John Hardin Young, Arnold I. Kalman, Kathleen H. Larkin, Norman E. Greenspan, Lawrence S. Bauman, Philadelphia, Pa., for Zenith Radio Corporation and National Union Electric Corporation, plaintiffs.

Morton P. Rome, Wyncote, Pa., for National Union Electric Corporation, plaintiff.

Philip J. Curtis, John Borst, Jr., Glenview, Ill., for Zenith Radio Corporation, plaintiff.

Mudge, Rose, Guthrie & Alexander by Donald J. Zoeller, John P. Hederman, Thomas P. Lynch, Howard C. Crystal, Robert A. Jaffe, Shelly B. O'Neill, Mark K. Neville, Jr., New York City, Drinker, Biddle & Reath by Patrick T. Ryan, Philadelphia, Pa., for Tokyo Shibaura Elec. Co., Ltd. and Toshiba America, Inc., defendants; defense coordinating counsel.

Duane, Morris & Heckscher by Henry T. Reath, Terry R. Broderick, Philadelphia, Pa., Crummy, Del Deo, Dolan & Purcell by John T. Dolan, Newark, N.J., Baker & McKenzie by Hoken S. Seki, Thomas E. Johnson, Chicago, Ill., for Mitsubishi Electric Corporation.

Reid & Priest by Charles F. Schirmeister, Robert J. Lynch, New York City, L. Peter Farkas, Washington, D.C., for Mitsubishi Corporation and Mitsubishi International Corporation, defendants.

Weil, Gotshal & Manges by Ira M. Millstein, A. Paul Victor, John F. Carney, Joel B. Harris, Kevin P. Hughes, Robert K.

Hood, H. Adam Prussin, Jeffrey L. Kessler, Stuart Peim, Lenore Liberman, Gayle E. Hanlon, Alan Rothstein, Makoto Matsuo, New York City, Morgan, Lewis & Bockius by Raymond T. Cullen, Philadelphia, Pa., for Matsushita Elec. Indus. Co., Inc., Matsushita Elec. Corp. of America, Matsushita Electronics Corp., Matsushita Elec. Trading Co., and Quasar Electronics Corp., defendants.

Metzger, Shadyac & Schwarz by Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Stephen P. Murphy, William B. T. Mock, Jr.; Tanaka, Walders & Ritger by Lawrence R. Walders, B. Jenkins Middleton, Washington, D.C., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Hitachi, Ltd., Hitachi Sales Corporation of America, and Hitachi Kaden Hanbai Kabushiki Kaisha, defendants.

Wender, Murase & White by Peter J. Gartland, Gene Yukio Matsuo, Peter A. Dankin, Lance Gotthoffer, New York City, for Sharp Corporation and Sharp Electronics Corporation, defendants.

Whitman & Ransom by Patrick H. Sullivan, Dugald C. Brown, Kevin R. Keating, Michael S. Press, New York City, Pepper, Hamilton & Scheetz by Charles J. Bloom, Philadelphia, Pa., for Sanyo Elec., Inc., Sanyo Elec. Co., Ltd., and Sanyo Elec. Trading Co., Ltd., defendants.

Arnstein, Gluck, Weitzenfeld & Minow by Louis A. Lehr, Jr., Stanley M. Lipnick, John L. Ropiequet, Chicago, Ill., for Sears, Roebuck & Co., defendant.

Rosenman, Colin, Freund, Lewis & Cohen by Asa D. Sokolow, Renee J. Roberts, Marc Rowin, Kaye, Scholer, Fierman, Hays & Handler by Joshua F. Greenberg, New York City, Wolf, Block, Schorr & Solis-Cohen by Franklin Poul, Philadelphia, Pa., for Sony Corp. and Sony Corp. of America, defendants.

Kirkland & Ellis by Thomas P. Coffey, E. Houston Harsha, Karl F. Nygren, Chicago, Ill., for Motorola, Inc., defendant.

## OPINION AND ORDER (1916 ANTIDUMPING ACT)

EDWARD R. BECKER, District Judge.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 1194 |
| II. | CONTENTIONS OF THE PARTIES | 1198 |
| | A. The Defendants | 1198 |
| | B. The Plaintiffs | 1201 |
| III. | THE FACTUAL RECORD ON SUMMARY JUDGMENT | 1202 |
| | A. Introduction | 1202 |
| | B. Physical Similarities and Differences Between U. S. and Japanese Television Receivers | 1204 |
| | C. Effect of the Physical Differences on Consumer Use and Marketability | 1206 |
| | D. Physical Differences Between U. S. and Japanese Non-Television Consumer Electronic Products; Effects Thereof on Consumer Use and Marketability | 1210 |
| IV. | ANALYSIS OF THE ANTIDUMPING ACT OF 1916 | 1211 |
| | A. Introduction | 1211 |
| | B. The Statutory Text | 1213 |
| | 1. Similarities to Antitrust Statutes | 1213 |
| | 2. Incorporation of Customs Appraisement Terminology | 1215 |
| | C. Antitrust and Tariff Law and Politics in the First Wilson Administration | 1217 |
| | D. Legislative History of the Antidumping Act of 1916 | 1220 |

E. Relationship Between the Antidumping Act of 1916 and the Antidumping Act of 1921 ... 1223

V. THE DEGREE OF SIMILARITY REQUIRED FOR PRODUCT COMPARISONS UNDER THE 1916 ANTIDUMPING ACT ... 1226

A. Introduction ... 1226

B. Applicability of the 1916 Act to Non-Identical Goods ... 1227

C. The Standard of "Like Grade and Quality" Under the Clayton Act and the Robinson-Patman Act ... 1231

D. The Standard of Similarity Under the Tariff Acts ... 1234

VI. STANDARDS FOR SUMMARY JUDGMENT; APPLICATION OF THE LEGAL STANDARDS OF COMPARABILITY TO THE FACTS ... 1239

VII. CERTIFICATION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b) ... 1243

## I. PRELIMINARY STATEMENT

Dumping is a phenomenon in international trade which has been defined as "price discrimination between purchasers in different national markets."[1] Generically, dumping is the sale of commodities in a foreign market at a price which is lower than the price or value of comparable commodities in the country of their origin. The issue before us arises in the context of the alleged dumping in the United States of television receivers, radios, phonographs and tape and cassette recorders manufactured in Japan. Plaintiffs Zenith Radio Corporation ("Zenith") and National Union Electric Corporation ("NUE") have alleged in their complaints that the Japanese defendants[2] and their co-conspirators[3] are and have been participants in a conspiracy which, by artificially lowering export prices, has for more than 20 years sought the methodical destruction of the United States domestic consumer electronic products industry. This litigation is described generally at pp. 1195–1198 of our opinion on subject matter jurisdiction, filed this day. Instead of rescribing that description here, we simply incorporate those pages by reference. Suffice it here to say that this is one of the most massive cases ever heard by the United States courts, and that in addition to numerous claims under the antitrust laws, plaintiffs seek treble damages for alleged violations of the Antidumping Act of 1916,[4] one of several dumping statutes enacted by the Congress.

---

1. J. Viner, Dumping: A Problem in International Trade 4 (1923, reprinted 1966).

2. The ten principal defendants are Mitsubishi Corporation, a Japanese trading company; Matsushita Electric Industrial Co., Ltd., Toshiba Corporation, Hitachi, Ltd., Sharp Corporation, Mitsubishi Electric Corporation ("MELCO"), Sanyo Electric Co., Ltd., and Sony Corporation, all Japanese manufacturers of consumer electric products; and two American companies, Motorola, Inc. and Sears, Roebuck & Co. Fourteen other defendants are subsidiaries of the principal Japanese defendants. Of the twenty-four defendants, fifteen are defendants in both suits, seven in the Zenith action only, and two in the NUE action only.

3. In addition to the twenty-four named defendants, the plaintiffs have identified dozens of alleged coconspirators whose business operations span the globe, ranging from small Japanese companies to such world industrial giants as N. V. Phillips Gloeilampenfabrieken and General Electric.

4. The Antidumping Act of 1916, hereinafter variously "the 1916 Antidumping Act," "the 1916 Act," or, where appropriate, "the Act," is here reproduced in full:

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to

This opinion addresses the separate motions of several groups of defendants for summary judgment on the plaintiffs' 1916 Antidumping Act claims. The motions addressed to the 1916 Act claims have been advanced as part of wider motions seeking summary judgment on other discrete portions of the litigation as well. Motions which deal with the 1916 Act claims have been filed by Mitsubishi Electric Corporation and Melco Sales, Inc.; by Sears, Roebuck and Co.; by Matsushita Electric Industrial Co., Ltd., and affiliated defendants; and by Hitachi, Ltd., Toshiba Corporation, Sanyo Electric Co. and their affiliated defendants.[5] The numerous summary judgment motions concerning this and other issues are catalogued in our opinion on subject matter jurisdiction. As is explained there, we intend to decide the pending motions issue by issue, writing separate opinions on each issue if necessary. Accordingly, this opinion disposes of the arguments based on the 1916 Antidumping Act made in all of the motions listed above, and does not reach the other issues which are comprehended in these motions.

In order to decide the defendants' motions for summary judgment on plaintiffs' dumping claims, we are required to interpret the 1916 Act and to apply it to the undisputed facts before us. Although television sets and other consumer electronic products manufactured for sale and use in the United States, as a class, and consumer electronic products manufactured for sale and use in Japan, as a class, look essentially the same and serve precisely the same functions for the listener or viewer, U. S. and Japanese consumer electronic products[6] are

which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: *Provided,* That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States.

Any person who violates or combines or conspires with any other person to violate this section is guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding $5,000, or imprisonment not exceeding one year, or both, in the discretion of the court.

Any person injured in his business or property by reason of any violation of, or combination or conspiracy to violate, this section, may sue therefor in the district court of the United States for the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages sustained, and the cost of the suit, including a reasonable attorney's fee.

The foregoing provisions shall not be construed to deprive the proper State courts of jurisdiction on actions for damages thereunder.

15 U.S.C. § 72. The plaintiff's claims under the 1916 Act are stated in Count I of the Complaint of plaintiff NUE, in Count VII of the Complaint of plaintiff Zenith, and in Count VI of Zenith's Counterclaim. NUE's claims involve only television receivers, while Zenith's claims encom-

pass other consumer electronic products as well.

5. The Hitachi-Toshiba-Sanyo motion was joined by Sharp Corporation, Mitsubishi Corporation, and their subsidiaries. Sony Corporation and its subsidiary have moved separately for summary judgment on factual grounds particular to Sony, but have also asserted the legal theory which is addressed in this opinion. Three of the four motions listed in the text are addressed to other matters as well as the 1916 Act claims. Sears Roebuck's motion is concerned only with Zenith's dumping claims as stated in Count VI of the Zenith Counterclaim.

These motions and others raise additional questions concerning the construction of the 1916 Act, apart from the comparability issue which is addressed in this opinion. In particular, a number of arguments have been made concerning the predatory intent proviso of the Act. We do not reach these arguments here.

6. Throughout this opinion, we refer on occasion to "U. S." products and "Japanese" products, as a shorthand for products manufactured for sale and use in the United States and in Japan, respectively. In deciding the instant motions, we are only concerned with products manufactured in Japan; we are deciding whether products manufactured in Japan for the Japanese domestic home market are comparable with products manufactured in Japan for exportation to the United States. The products made by American manufacturers and their characteristics are not discussed anywhere in this opinion. Consequently, the appellation "U. S.," whenever used in this opinion, refers to the place of intended use of electronic products, and never to their place of manufacture.

adapted to the technical conventions of television and FM broadcasting and of the electrical power systems which are different in the two countries. While the standards for encoding visual and aural information on a radio wave are identical in the television and FM systems of the U. S. and Japan, the frequencies allocated to TV and FM broadcasts are different. As a result, television and FM receivers manufactured for use in Japan cannot receive many broadcasts in the U. S. and vice versa. In addition, the Japanese electrical power system uses 100 volts and frequencies of either 50 or 60 Hertz ("Hz"), while the U. S. system is at 120 volts and only 60 Hz. Because of this difference, Japanese television receivers used in the U. S. would be in serious danger of failing because of overheating, Japanese phonographs and tape recorders of a certain design would run at the wrong speed, and the audio output of radios, phonographs, and tape recorders would include an objectionable hum.

These facts, which are undisputed, form the background for the task before us in this opinion—*i. e.*, the first construction in the 64 years since the enactment of the 1916 Act of its core provisions. More specifically, we must decide what standards the Act imposes for the comparability of the United States and foreign products required in order for an import transaction to be subject to the prohibition of the 1916 Act.

While the contentions of the parties will be set forth in detail *infra,* suffice it to say for purposes of this preliminary statement that the defendants, arguing from the text of the 1916 Act which uses the referent "such articles," contend that goods do not meet the comparability standards of the Act unless they are identical which concededly the goods in question are not. Alternatively, defendants argue that the "like grade and quality" standard of § 2 of the Clayton Act, which preceded the 1916 Act, is applicable, a standard which defendants assert, plaintiffs have not met. Plaintiffs, on the other hand, vigorously protest over-

literal constructions and assert that television sets manufactured for use in the United States and those manufactured for use in Japan are both television sets serving precisely the same function, and that with the exception of adaptation to the technical conventions of the two countries, they are essentially the same. Just as the defendants contend that the 1916 Act does not apply, the plaintiffs vigorously assert that it does.

The precise question before us is whether TV sets and other consumer electronic products manufactured for sale and use in the United States, as a class, and consumer electronic products manufactured for sale and use in Japan, as a class, are sufficiently similar to be comparable for purposes of the 1916 Act even though: (1) the two classes of products are adapted to the different technical conventions of the two countries; (2) accordingly, the products have different tuners, power transformers, and electric motors; and (3) as a result, the products differ in consumer use and marketability and are not commercially interchangeable. As will be seen during the course of our lengthy discussion, we answer this question in the negative, holding that the two classes of products are not comparable under the 1916 Act.

Although the Antidumping Act of 1916 has been in force for nearly 64 years, it has rarely been used and therefore has rarely been construed. In order to resolve the issue before us we find it necessary to examine the legislative history of the Act, and its background in contemporary law and politics, in far greater depth than has heretofore been recorded. Our detailed analysis of the 1916 Act is contained in Part IV of this opinion. We also have occasion to compare the 1916 Act, which creates a private right of action for treble damages and provides criminal penalties for dumping, with the Antidumping Act of 1921 ("the 1921 Act" or "the 1921 Antidumping Act"), which established an administrative system for the assessment of special customs duties for dumping. The 1921 Antidumping Act

has very recently been repealed but the system of dumping duties which it created remains essentially intact in its successor legislation. The 1921 Antidumping Act is involved in this litigation because the plaintiffs seek to introduce into evidence the fact that the Treasury Department, which formerly administered the 1921 Act, has assessed dumping duties against many of the defendants for importing television receivers from Japan at prices lower than those at which comparable models have been sold in Japan. As is set forth more fully in a subsequent part of this opinion, we hold that the administrative findings of dumping under the 1921 Act are not pertinent to the instant claims of privately actionable dumping under the 1916 Act because the 1921 Act and its successor legislation grant the administering authority broad discretion to determine whether products sold in the two countries are comparable, whereas litigants under the 1916 Act are not clothed with the same discretion.

As will be seen, our examination of the legislative history of the 1916 Act reveals that it was intended to complement the antitrust laws by imposing on importers substantially the same legal strictures relating to price discrimination as those which had already been imposed on domestic businesses by the Clayton Antitrust Act of 1914. Conforming to the will of Congress, we will hold that the 1916 Act cannot be applied to articles which are not sufficiently similar to be comparable for purposes of domestic price discrimination law. Hence, to give rise to a violation of the 1916 Act, the products sold in the United States and the products sold in the foreign country must be of "like grade and quality" as that phrase is used in § 2 of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13. Case law under the Robinson-Patman Act makes it clear that physically different articles are not of "like grade and quality" if the differences affect consumer use and preference or marketability.

Although the 1916 Act was intended as a companion to the antitrust laws, Congress borrowed language from contemporary customs appraisement law to refer to the price of goods in the foreign country. As we shall explain, by using the term "actual market value or wholesale price," Congress incorporated by reference the valuation provisions of the Tariff Act of 1913 ("the 1913 Act" or "the 1913 Tariff Act"). Under that statute, and under both earlier and subsequent practice, the value of imported merchandise could be determined by reference to sales of "similar" merchandise in the country of origin. The standard employed to decide whether merchandise was sufficiently "similar" was strict, however: "similar" merchandise had to be commercially interchangeable with the articles under appraisement. Because of the use of language taken from the 1913 Tariff Act in the 1916 Antidumping Act, we will hold that there is no violation of the 1916 Act unless the standards of similarity of customs appraisement law are met.

Both of the legal standards which we find applicable speak in terms of consumer use, consumer preference, and marketability. The standard derived from customs appraisement law is the more rigorous of the two: it requires commercial interchangeability. While we recognize that the relevant differences between consumer electronic products manufactured for use in the U. S., as a class, and those manufactured for use in Japan, as a class, are only adaptations to the differing technical conventions of the two countries, their impact on consumer use, consumer preference, and marketability is clear: a product manufactured for sale in one nation is of no practical use to a consumer in the other nation. Consequently, the products do not meet the standards which are applicable to product comparisons under the 1916 Antidumping Act, and summary judgment on the 1916 Act claims must be granted.[7]

7. In conjunction with granting summary judgment, we dismiss Count I of NUE's Complaint, which states NUE's claims under the 1916 Act and is limited to television receivers. Zenith's claims under the 1916 Act encompass non-television products as well as television receivers, and, as will appear in due course, a small category of non-television products escapes the ef-

The foregoing is a capsule summary of the ultimate conclusions of this opinion. In the course of its development we have many tasks. Our first task is to state the parties' contentions, both legal and factual. Next we will make "findings" of the facts as to which no genuine issue exists. In the next following portion of the opinion, we review the 1916 Antidumping Act in general terms, analyzing its language, its legislative history, and its background in the law and politics of the first administration of Woodrow Wilson. After this review, we address our attention to the particular legal issues raised by the instant motions. In the penultimate part of this opinion, we discuss the standards controlling the grant of summary judgment and demonstrate that summary judgment is required here. Finally, we explain our reasons for certifying our order for immediate interlocutory appeal under 28 U.S.C. § 1292(b).

## II. CONTENTIONS OF THE PARTIES

### A. *The Defendants*

The principal argument which defendants have advanced in support of their motions for summary judgment on plaintiffs' dumping claims hinges on the meaning of the word "such." [8] The 1916 Act mandates that the price at which imported articles are sold within the United States be compared with "the actual market value or wholesale price of *such* articles" in a foreign country, after certain expenses are added to the foreign value. 15 U.S.C. § 72 (emphasis added). From this juxtaposition alone, the defendants contend that the 1916 Act contemplates a comparison of the price of *identical* articles sold in the U. S. and in the relevant foreign market. This simplistic argument is, however, not strongly pressed; rather, the defendants rely upon a line of cases in

the customs courts, which interpret the word "such" in a related context.

Unlike the 1916 Act, which uses the lone term "such" in the phrase we have just quoted, many other customs appraisement statutes use the language "such or similar" to specify which articles may be considered by the customs appraiser in his determination of value. In construing the phrase "such or similar," the customs courts have held as follows: (1) the word "such" means identical; (2) when applying an appraisement statute which includes that phrase, an appraiser should look first to sales of identical merchandise, and should only look to sales of similar merchandise if identical merchandise is not sold in the relevant market; and (3) whether or not merchandise is "similar" within the meaning of customs appraisement statutes is to be determined by the application of several criteria, including commercial interchangeability of the putatively "similar" articles. *E. g., United States v. Irving Massin & Bros.*, 16 Ct.Cust. App. 19 (1928); *United States v. Johnson Co.*, 9 Ct.Cust.App. 258 (1919).

Relying on this line of customs decisions, defendants argue that the word "such," standing alone in the context quoted in the 1916 Antidumping Act, should be interpreted to mean "identical." They contend that by using the single word "such" in the 1916 Act, where it might have used the disjunction "such or similar," Congress must have intended to limit the application of the Act to situations in which identical merchandise is sold in the United States and in relevant foreign market. Accordingly, they argue that the 1916 Act is inapplicable in this litigation unless the consumer electron-

---

fects of our summary judgment order. Accordingly, we do not dismiss the Zenith 1916 Act claims *in toto.*

**8.** Some of the arguments stated in this part of our opinion have been made by all the moving defendants; some arguments have been made only by one defendant or one group of defendants. We make no attempt here to ascribe particular arguments to the particular defendants who made them. We do not consider in this opinion the contention of defendants Sharp

Corporation and Sharp Electronics Corporation that any claim under the 1916 Antidumping Act is barred by the 1953 Treaty of Friendship, Commerce and Navigation with Japan, 4 U.S.T. 2063, T.I.A.S. 2863. While that contention is properly before us, the plaintiffs have not had the opportunity to respond to it. We have scheduled argument on the Sharp defendants' contentions based on the 1953 Treaty for June 18, 1980.

ic products sold in the United States and in Japan are identical.[9]

To establish the factual predicate for their summary judgment motions, defendants have submitted numerous affidavits and have taken the depositions of several of plaintiffs' expert witnesses. In a subsequent part of this opinion, we state the material facts as to which there is no genuine issue, and there is no reason to duplicate that exposition here. For our present purposes, it is sufficient to note that defendants' affidavits are advanced to show that there are specific physical differences between consumer electronic products manufactured for use in the United States, as a class, and those manufactured for use in Japan, as a class.[10] These differences arise from the different technical conventions of television and FM radio broadcasting, and of the transmission of electrical power, in the two countries. Since the evidence produced by the defendants tends to show specific differences between U. S. and Japanese products, it tends to demonstrate, *a fortiori*, that in defendants' contention those products are not identical.

The defendants have also advanced several other arguments concerning the comparability of U. S. and Japanese consumer elec-

tronic products under the 1916 Antidumping Act. Noting that the 1916 Act had an underlying antitrust purpose, they posit that the Clayton Antitrust Act of 1914, which banned price discrimination but applied only to domestic transactions, exempted from its proscription any price discrimination made "on account of differences in the grade [or] quality" of the articles sold. They submit that because of this language the Clayton Act, like the 1916 Antidumping Act, required physical identity of the products sought to be compared on a charge of domestic price discrimination. They note also that Section 2 of the Clayton Act, as amended by the Robinson-Patman Act of 1936, which currently governs domestic price discrimination, applies only to sales of commodities which are of "like grade and quality." 15 U.S.C. § 13(a). They accordingly argue that the 1916 Act must be interpreted in light of § 2 of the Clayton Act, and that because of the undisputed physical differences between U. S. and Japanese consumer electronic products, which affect their marketability, they are not of "like grade and quality." The defendants' argument based on the Robinson-Patman Act was originally set forth in no more than

**9.** Some of the defendants have also argued that plaintiffs' 1916 Act claims should be dismissed because U. S. consumer electronic products do not have an "actual market value or wholesale price" in Japan. They rely on *Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384, 408–09 (D.Del.1978), in which Judge Schwartz dismissed a claim under the 1916 Antidumping Act for the alleged dumping of golf carts manufactured in Poland. It was undisputed in *Pezetel* that the defendants' golf carts were not sold in Poland and were not commonly exported to third countries, but were sold only in the U. S. Judge Schwartz ruled that the 1916 Act does not provide a private right of action to challenge activity in a single market, *i. e.*, the United States, and accordingly dismissed the dumping claims.

The defendants in the instant case try to assimilate this litigation to *Pezetel* by arguing that there are no relevant sales in Japan because products made for sale in the U. S. are not sold in Japan. This argument, however, "puts the rabbit in the hat" by assuming that the consumer electronic products which defendants concede *are* sold in Japan are not comparable with those sold in the U. S., either

because they are not identical or because they are not sufficiently similar. In *Pezetel*, in contrast, there were *no* sales of golf carts of any type in Poland or in relevant third countries. Because defendants' argument relying on *Pezetel* assumes what is to be proved, *i. e.*, that the standard for comparability of products under the 1916 Act is not met here, we consider it to be merely an alternate verbal formulation of defendants' main arguments on comparability.

**10.** While the differences with which we are concerned in this opinion are those between U. S. products, as a class, and Japanese products, as a class, there are also, in some instances, individual differences between the particular products which plaintiffs have sought to pair for their dumping comparisons. Such individual differences are revealed in the model-by-model matchups to which we will refer in our discussion of the factual record. *See* pp. 1202–1203, *infra*. The defendants have not based their arguments on these individual differences; neither however have they conceded that the class-by-class differences are the only pertinent ones.

two pages of their memoranda supporting their motions, but the argument has assumed increased prominence in their latest submission dated March 7, 1980.

Alternatively, the defendants contend that U. S. and Japanese consumer electronic products are not even "similar," as that term is construed in post-1916 customs appraisement law. As we have noted, the customs courts have held that "similar" articles must be, *inter alia*, commercially interchangeable. Defendants point in particular to two decisions. In *United States v. Eggen*, 55 C.C.P.A. 95 (1968), the Court of Customs and Patent Appeals held that ball bearings in metric sizes were not "similar" to ball bearings in inch sizes, because the two were not commercially interchangeable. In *United States v. Ford Motor Company*, 46 Cust.Ct. 735 (1961), the Customs Court held that right-hand-drive automobiles manufactured for use in Ireland were not "similar" to left-hand-drive automobiles manufactured for use in the United States, again because the two types of automobiles were not commercially interchangeable. The argument based on construction of the word "similar" in customs appraisement law was originally set forth in a brief footnote in a Sears Roebuck memorandum, but like the Robinson-Patman argument it has assumed increased prominence in defendants' latest submission.

In response to our request, the parties submitted supplemental memoranda on the legislative, political, and social history of the 1916 Antidumping Act.[11] In their joint memorandum, the defendants argue that "the 1916 Act was firmly rooted in antitrust principles and was passed by a Congress whose majority was fervently anti-protectionist." They contend that the Act should therefore be construed in harmony with the antitrust laws to foster, and not to inhibit, vigorous price competition in United States markets.

The defendants have also argued that the 1916 Act includes criminal penalties, and was viewed by Congress primarily as a criminal provision. Although the criminal penalties created by the Act are not involved in this civil litigation, defendants point out that whatever construction we give the statute might be applied in future criminal cases, and therefore argue that we should construe the statute strictly against those who seek to invoke its provisions. *See FCC v. American Broadcasting Co.*, 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954). While we do not address this argument specifically in our discussion, we are mindful that the 1916 Act is a criminal as well as a civil statute. The criminal side of the statute does not affect our reasoning, however, for we are convinced that we would interpret the Act as we do in this opinion even if this were a criminal prosecution under the 1916 Antidumping Act.

 The defendants have also advanced several arguments concerning the interpretation of the 1916 Act with respect to issues besides the comparability of U. S. and Japanese products. These other arguments concern the interpretation of two other key phrases in the statute: the predatory intent clause, and the language making the statutory prohibition applicable to "any person importing or assisting in importing." *See* n. 4, *supra* (quoting the Act in full). For example, some defendants have argued that in order to show predatory intent, plaintiffs must show that each defendant sold its products at a price below its marginal cost, citing, *e. g.*, Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975), or that the defendant has a sizable share of the market. Some defendants have argued that they have neither imported nor assisted in importing products from Japan to the United States because their sales are made only in Japan. In addition, several defendants have argued that the Act is inapplicable to them because they sell consumer electronic products only in the United States, and the

---

11. All told, the various defendants submitted a total of 13 briefs which deal, in whole or in part, with issues discussed in this opinion. The plaintiffs submitted 8 briefs. In addition, we heard extensive oral argument on the motions.

Act should be applied only to companies which themselves sell products in both markets.[11A] With a single exception, we need not, hence we do not reach any of these arguments.[12]

## B. *The Plaintiffs*

The plaintiffs argue that defendants' proposed construction of the 1916 Antidumping Act "is nothing more than an evisceration of the Act and a vehicle for frustrating the clear purposes of Congress." They point out that the customs decisions construing the phrase "such or similar" are all interpretations of other statutes, not of the 1916 Antidumping Act. They argue that the narrow construction of the term "such" in those decisions was necessary there to avoid rendering that word redundant, but is not necessary in the interpretation of the 1916 Act. They argue that a restrictive reading of the Act would be at odds with its remedial purpose, and that Congress intended to broadly proscribe unfair methods of competition in international trade. Noting, as do defendants, that the Act was primarily intended to complement the antitrust laws, plaintiffs contend that private antitrust plaintiffs should be favored and not hindered in their efforts to enforce the antitrust laws, and that this principle should apply equally to plaintiffs seeking damages under the 1916 Antidumping Act. They characterize defendants' reading of the Act as "hypertechnical," and contend that the Act should be read to permit the comparison of products in broad, common-sense generic categories. Plaintiffs here focus, needless to say, on the obvious functional similarity between Japanese TV sets and other products, as used by consumers in Japan, and U. S. TV sets and other products, as used by consumers in the U. S.

Plaintiffs also observed that the ordinary meaning of the word "such" is not so narrow as the construction for which defendants contend, and produce many pages of dictionary definitions to support their argument. They next argue that the expression "actual market value or wholesale price of such articles" means the actual market value or wholesale price of the very articles imported into the United States, and that those articles can have an actual market value in Japan even though identical articles are not sold in Japan. This contention is supported by an extensive review of customs appraisement law, including in particular ¶ R of the Tariff Act of 1913, which defined "actual market value or wholesale price" and was in force when the 1916 Antidumping Act was passed. Plaintiffs point out that ¶ R permitted customs appraisers to refer to sales of similar but not identical merchandise to determine the value of goods undergoing appraisement, and argue that the same rule should be applied in the interpretation of the 1916 Antidumping Act. Plaintiffs have not responded to defendants' arguments based on the Robinson-Patman Act and on post-1916 customs interpretations of the term "similar."

---

**11A.** Sears Roebuck has recently filed a motion arguing that Zenith's dumping claims against it, which were made in Zenith's Counterclaim filed March 17, 1977, are barred by the statute of limitations. Sears, which is not a defendant in the NUE action, contends that the relevant statute of limitations is the Pennsylvania six-year statute, 12 P.S. § 31.

In addition, Motorola contends in a recent motion that the dumping claim against it must be dismissed because Zenith has failed to set forth in the FPS any facts supporting a dumping claim against Motorola. Motorola is not a defendant in the NUE action.

**12.** We reject the contention of defendants Mitsubishi Corporation and Mitsubishi International Corporation that plaintiffs cannot establish predatory intent with respect to defendants whose market share in sales of consumer electronic products in the United States is small. The 1916 Antidumping Act, unlike *e. g.* section 2 of the Sherman Act, does not require plaintiffs to show that any defendant's predatory intent was accompanied by a dangerous probability of success. Thus the plaintiff is entitled to attempt to establish a defendant's predatory intent by inference, even if the defendant's small market share makes it unlikely that it will succeed in injuring American industry. Moreover, plaintiffs claim that all the Japanese defendants and their coconspirators joined a conspiracy which had the requisite predatory intent; if the plaintiffs can produce evidence *aliunde* of the conspiracy and of particular defendants' membership in it, the defendants who joined the conspiracy will be chargeable with its intent.

With respect to the facts, plaintiffs admit that most of the specific differences between U. S. and Japanese consumer electronic products which defendants have identified do exist. Plaintiffs' affiant and expert witnesses aver, however, that these differences are insignificant technically and do not substantially affect the cost of manufacturing U.S. and Japanese products. Plaintiffs argue that because the differences are insignificant from a technical or cost standpoint, the differences do not affect the comparability of U. S. and Japanese products.

In their memorandum on the legislative, political, and social history of the 1916 Act, plaintiffs characterize the Act as an "economic statute" which has both protectionist and antitrust aspects. They argue that the Act was the product of a political compromise between the Democratic majority in Congress, which opposed tariff protectionism, and the Republican minority, which was avowedly protectionist. Any protectionist facet of the statute would, of course, help plaintiffs' cause.

Having completed our review of the parties' contentions, we turn next to an examination of the factual record before us on the motions for summary judgment.

## III. THE FACTUAL RECORD ON SUMMARY JUDGMENT

### A. *Introduction*

In deciding the instant motions addressed to plaintiffs' 1916 Act claims, we have consulted all pertinent evidentiary sources.[13] These include the numerous affidavits filed in support of and opposition to the motions, testimony taken in depositions, plaintiffs' expert witness reports on product comparisons, the model-by-model matchups submitted by the plaintiffs, and the relevant portions of the plaintiffs' Final Pretrial Statement. As will be seen, these sources reveal that the facts which are material to the instant motions are not in dispute, although of course the parties disagree vigorously on the significance of the undisputed facts. The facts which we relate in the following pages are, without exception, admitted by the plaintiffs, and there is accordingly not even the slightest doubt as to their veracity. Before relating these facts it is important that we discuss their evidentiary foundation.

The various defendants have submitted the affidavits of six persons to support their motions on the 1916 Act claims: Masami Itoga (Mitsubishi Electric Corp.), Harry E. Ruther, Jr. (Sears, Roebuck & Co.), Gordon Reichard (Sears, Roebuck & Co.) (two affidavits), Nobuyuki Yamataka (Matsushita Electrical Industrial Co.), M. Yoshida (Sharp Electronics Corp.), and Akio Morita (Sony Corp.) (¶ 64). Defendants have also referred to the deposition testimony of Zenith executives Vito Brugliera and Karl H. Horn.[14]

Plaintiffs' principal affiant with respect to product comparisons under the 1916 Antidumping Act is Vito Brugliera, Manager of Value Engineering for Zenith. He has submitted six affidavits responding to defendants' affiants, and one affidavit in response to our request. Plaintiffs have also submitted the affidavits of George A. Schupp and Rocco F. Mainiero, two other Zenith officials.[15]

---

**13.** We reject the contention of defendant MELCO that the record for summary judgment closed at some date prior to the filing of plaintiffs' Expert Witness Reports and Final Pretrial Statement. *See* discussion in our opinion on subject matter jurisdiction filed this day, 494 F.Supp. 1161, 1168–1170.

**14.** In addition, defendants have referred to the deposition testimony of Walter C. Fisher, a Zenith executive, and to a letter of William G. Frick, Executive Vice President of Zenith International Sales Corp., dated February 7, 1974, produced as Zenith Document Nos. 30519–20. The Fisher testimony and Frick letter are primarily relevant to cost issues which we do not consider. *See* n. 23, *infra*.

**15.** Plaintiffs have also referred to statements in Toshiba Document No. TJ 4629 (Zenith Document No. 4863). According to plaintiffs' translation of that document, S. Yajima, a Toshiba employee, wrote "[t]he same thing exported is to be sold domestically." In context, the statement appears to refer to the cabinet for a television receiver. In light of the undisputed physical differences between U.S. and Japanese television receivers, *see* text *infra*, and although we are mindful of our duty to make all inferences favorable to the plaintiffs, we cannot

Plaintiffs have also submitted two expert witness reports on the technical comparability of consumer electronic products manufactured for the Japanese market with products manufactured for the U. S. market. The report of Walter Lukas on behalf of plaintiff National Union Electric Corporation concerns only television receivers, which are the only products involved in NUE's claim. The report of Karl Horn and Vito Brugliera on behalf of Zenith addresses the comparability of television receivers, radios, phonographs, and tape recorder/players. Both reports are based on voluminous and detailed model-by-model matchups, which were made independently by the authors of each report.[16] The reports include exposition of the technological basis for the matchups and the method of their construction, and express opinions, based on the matchups, as to the technological comparability of the products sold in the U. S. and in Japan.

The matchups constructed by the plaintiffs' expert witnesses do not take into account the categorical differences between products manufactured for the Japanese market, as a class, and those manufactured for the U. S. market, as a class, which are detailed *infra*. Lukas states explicitly that these differences are "general considerations" which "do not materially impact upon technological comparability." *See* n. 22, *infra*. The method of selecting comparable models which Lukas describes in his report makes no allowances for differences in tuners and power supply components to accommodate the differences we describe below. Although the Horn/Brugliera re-

port does not include an explicit disclaimer of the sort made by Lukas, the detailed explanation in that report of the method of their construction of the model-by-model matchups makes it clear that the differences we describe were not factors in their analysis either. Plainly, the model-by-model matchups are based on the assumption that those differences are not *legally* significant. Since the matchups constructed by plaintiffs' experts do not address but do not contravene the differences described herein, the validity of the matchups as essential support for plaintiffs' claims under the 1916 Antidumping Act is wholly dependent on whether or not we agree with the assumption upon which the matchups are based: that the undisputed physical differences between products used in Japan and those used in the U. S. are legally insignificant.

The plaintiffs' Final Pretrial Statement ("FPS") was filed pursuant to Pretrial Order No. 154, a case management order which we entered on March 20, 1979, to govern the final pretrial phases of this gargantuan litigation. Pretrial Order No. 154 has been published as an appendix to our opinion certifying for interlocutory appeal our prior opinion and order concerning plaintiffs' Seventh Amendment right to civil trial by jury, 478 F.Supp. 889, 946–60 (E.D.Pa.1979), *appeal pending*, No. 79–2540 (3d Cir. filed Sept. 20, 1979). The requirements governing the FPS are set forth in Part III of Pretrial Order No. 154, 478 F.Supp. at 949–50. Plaintiffs were required to set forth in narrative form each fact which they intend to prove at trial. *Id.* Part III–C, 478 F.Supp. at 949. The FPS

infer from this lone statement that there is a genuine issue of fact as to the specific differences detailed *infra*.

**16.** We required plaintiffs to prepare and file these model-by-model matchups during the discovery phase of this case in order to inform the defendants of plaintiffs' contentions concerning their dumping claims and the manner in which plaintiffs intend to prove their dumping case at trial, so that defendants would be able to prepare their defenses. The requirement for specific model-by-model matchups was necessary because there were literally thousands of television models made by the defendants during the

relevant time period, and many models of non-television products. As a result there was a virtually limitless number of possible pairings of models upon which plaintiffs might base their dumping claims. We required plaintiffs to select a limited number of home market and export models to pair for comparison. Because of the great technical detail involved in the selection of models for comparison, and more particularly because of the technical differences which were *not* considered by plaintiffs' experts in preparing model-by-model matchups, the matchups shed considerable light on the instant motions.

has preclusionary effect: except for good cause shown, the plaintiffs are precluded from offering at trial any facts or evidence to prove such facts which have not been disclosed to the defendants and the court in plaintiffs' FPS. *Id.* Part III–D, 478 F.Supp. at 949–50. The FPS which plaintiffs have filed, including appendices, errata, and addenda, contains more than 17,000 pages.

The plaintiffs' dumping claims as set forth in the FPS, vol. 17 at 8049–8273, are based on massive model-by-model price comparisons which they have submitted with the FPS as Appendices C, D, and J. The price comparisons are based on the matchups of models sold in the U. S. with models sold in Japan which were constructed by plaintiffs' experts Lukas and Horn/Brugliera. FPS vol. 17 at 8052 (television receivers); *id.* at 8151–64 (non-television consumer electronic products). As a result, the validity of the plaintiffs' dumping claims as set forth with preclusive effect in the FPS is dependent on the validity of the model-by-model matchups which were constructed according to the methods described in the reports of plaintiffs' expert witnesses. As we have noted, the validity of the matchups depends in turn on whether or not U. S. and Japanese consumer electronic products are comparable for purposes of the 1916 Antidumping Act despite the undisputed differences between them. Except insofar as it reveals plaintiffs' reliance on the model-by-model matchups to support their dumping claims, plaintiffs' FPS does not otherwise address the issues of product comparability which are involved in the instant motions.

We turn now to an exposition of the technical differences between consumer electronic products made for use in Japan and in the U. S., and the effects of those differences on consumer use and marketability of those products. We begin with television receivers, and then consider the same factual matters with respect to non-television products.

B. *Physical Similarities and Differences Between U. S. and Japanese Television Receivers*

Apart from variations between and among particular models of television receivers, which do not concern us here, there are technological differences between television receivers sold for use in the United States, as a class, and television receivers sold for use in Japan, as a class. There are also extensive similarities in the technology employed in the two classes of products. We address the similarities first, and then turn to the differences.

The function of any television receiver is to create sound and pictures by decoding information which has been encoded upon a radio signal of a particular frequency. There are three major systems in use for encoding audio and video information by altering the electrical characteristics of a radio signal:

PAL (Phase Alternating Line)

SECAM (Sequential Color and Memory); and

NTSC (National Television Standards Committee).

PAL is used in Germany; SECAM is used in France and the Soviet Union. NTSC is used in the United States and in Japan, and in many other countries. Because both Japan and the U. S. employ the NTSC standards, the electrical characteristics by which visual and auditory information are encoded on a radio frequency to convey sound and pictures to the consumer's home are identical in the two countries.[17] Because the

---

17. The following technical characteristics are common to both the U. S. and the Japanese television systems:

| | |
|---|---|
| Number of lines | 525 |
| Video bandwidth | 4 Mhz |
| Channel width | 6 Mhz |
| Sound carrier relative to picture carrier | +4.5 Mhz |
| Line frequency | 15750 Hz |
| Field frequency | 60 Hz |
| Picture frequency | 30 Hz |
| Picture modulation | AM |
| Picture modulation sense | Negative |
| Sound modulation | FM ±25 Khz |
| Sync waveform | +25% |
| Interlace | Two-to-one |
| Picture scan | Left-to-right and Top-to bottom |

standards are identical, the signal processing technology within television receivers used in the two countries is the same.

Television receivers designed for use in Japan could be operated in the United States, and receivers designed for use in the United States could be operated in Japan, if the following components were altered or replaced:

1. Very High Frequency (VHF) Tuner
2. Ultra High Frequency (UHF) Tuner
3. Power Transformer.

The functions of these components, and the reasons why identical ones cannot be used in the U. S. and in Japan, are explained *infra*. Television receivers which are physically identical except for these three components [18] could be operated in both countries.[19]

The material differences between U. S. and Japanese television receivers arise from two sources: the differing frequencies upon which television broadcasts are made, and differences in the available alternating current power supply. The U. S. and Japanese television systems differ in the allocation of radio frequencies for television broadcasts. In Japan, TV broadcasts are made on frequencies ranging from 90 to 108 megahertz ("Mhz") and from 170 to 222 Mhz for VHF broadcasts, and from 470 to 770 Mhz for UHF broadcasts. In the United States, VHF broadcasts are made on frequencies ranging from 54 to 88 Mhz and from 174 to 216 Mhz, and UHF broadcasts are made on frequencies ranging from 470 to 890 Mhz. It should be apparent from these figures alone that, although there is some overlap in both the VHF and the UHF bands, much of the frequency spectrum which is allotted to television broadcasts in each country is not so used in the other country. More importantly, the allocation of specific frequencies to particular television channels differs as between the U. S. and Japan.[20]

18. The defendants' affiant Gordon A. Reichard avers that a fourth component, the Video Intermediate Frequency System, would have to be altered or replaced. The VHF and UHF tuners in a television receiver convert the broadcast frequencies which they receive to a lower frequency known as the intermediate frequency ("IF") for transmission to the Video Intermediate Frequency System. The IF still has encoded upon it the audio and video information which will eventually be used to produce sound and pictures, after being processed by the Video Intermediate Frequency System and other components of the television receiver. The intermediate frequencies in use in the United States and in Japan are different. In the United States, the IF is 45.75 Mhz for video and 41.25 Mhz for audio; in Japan, the IF is 58.75 Mhz for video and 54.25 Mhz for audio. Although Reichard states that a TV receiver designed for use in one market could not be used in the other market without changes in the Video Intermediate Frequency System, presumably to accommodate the admitted difference in IF values, plaintiffs' affiant Vito Brugliera avers that physically and electronically identical components of this type could be used in the U. S. and in Japan. There is thus a genuine issue of fact on this point, but the issue is not material since the other differences between U. S. and Japanese products are sufficient for summary judgment under the legal standard formulated in Part V of this opinion.

19. Although receivers with only these differences would be physically capable of operation in both countries, receivers which are operable in Japan might not be *legally* operable in the United States because of federal standards governing the emission of radiation. *See* 21 C.F.R. Part 1020 (1979).

20. The following table sets forth the channel frequencies of the VHF band in the United States and Japan.

| CHANNEL | U.S.A. | JAPAN |
|---|---|---|
| 1 – Picture | None | 91.25 Mhz |
| 1 – Sound | None | 95.75 Mhz |
| 2 – Picture | 55.25 Mhz | 97.25 Mhz |
| 2 – Sound | 59.75 Mhz | 101.75 Mhz |
| 3 – Picture | 61.25 Mhz | 103.25 Mhz |
| 3 – Sound | 65.75 Mhz | 107.75 Mhz |
| 4 – Picture | 67.25 Mhz | 171.25 Mhz |
| 4 – Sound | 71.75 Mhz | 175.75 Mhz |
| 5 – Picture | 77.25 Mhz | 177.25 Mhz |
| 5 – Sound | 81.75 Mhz | 181.75 Mhz |
| 6 – Picture | 83.25 Mhz | 183.25 Mhz |
| 6 – Sound | 87.75 Mhz | 186.75 Mhz |
| 7 – Picture | 175.25 Mhz | 189.25 Mhz |
| 7 – Sound | 179.75 Mhz | 193.75 Mhz |
| 8 – Picture | 181.25 Mhz | 19 .25 Mhz |
| 8 – Sound | 185.75 Mhz | 197.75 Mhz |
| 9 – Picture | 187.25 Mhz | 199.25 Mhz |
| 9 – Sound | 191.75 Mhz | 203.75 Mhz |
| 10 – Picture | 193.25 Mhz | 205.25 Mhz |
| 10 – Sound | 197.75 Mhz | 209.75 Mhz |
| 11 – Picture | 199.25 Mhz | 211.25 Mhz |
| 11 – Sound | 203.75 Mhz | 215.75 Mhz |
| 12 – Picture | 205.25 Mhz | 217.25 Mhz |
| 12 – Sound | 209.75 Mhz | 221.75 Mhz |
| 13 – Picture | 211.25 Mhz | UHF BAND STARTS |
| 13 – Sound | 215.75 Mhz | UHF BAND STARTS |

The VHF and UHF tuners within a television receiver receive transmitted radio signals of desired frequencies, upon which audio and video information has been encoded. The tuners convert the received signals to specific lower frequencies, *see* n. 18, *supra*, and transmit the converted signal to other components of the TV receiver for processing. The VHF and UHF tuners employed in the U. S. and in Japan must be physically different to accommodate the different frequencies upon which television picture and sound are broadcast in the two countries.

As a result of the foregoing, Japanese television receivers could not receive most VHF television broadcasts in the United States, and *vice versa*, even if the sets were otherwise operable. The Japanese channels 8, 9, 10, and 11 correspond to the U. S. channels 10, 11, 12, and 13, respectively. A Japanese set operated in the U. S. could receive U. S. channels 10–13 and no others; a U. S. set operated in Japan could receive Japanese channels 8–11 and no others. The Japanese UHF band is wholly included in the U. S. UHF band; a U. S. set operated in Japan could receive all UHF broadcasts, but a Japanese set operated in the U. S. could not receive all U. S. UHF broadcasts.[21]

The U. S. and Japanese systems for the transmission of electrical energy in the form of alternating current also differ. Thus the power sources available for the operation of television receivers and other appliances are not the same in the two countries. In the United States, electric power is supplied at 120 volts, with a power frequency of 60 Hz; in Japan, power is supplied at 100 volts, with frequencies of either 50 Hz or 60 Hz in use in different parts of the country. The power transformers in television receivers convert incoming alternating current to direct current at a voltage appropriate to the electronic design of the receiver. Because television receivers used in the U. S. and in Japan are designed to operate on the available power supply, the power transformers in use in the two countries are different. However, receivers which are powered only by batteries could be used interchangeably in the two countries, if they were altered to receive the appropriate frequencies.

C. *Effect of the Physical Differences on Consumer Use and Marketability*

The plaintiffs' affiants and expert witnesses emphasize that the physical differences which we have outlined between television receivers sold in the U. S., as a class, and television receivers sold in Japan, as a class, are technically insignificant.[22] In de-

---

21. UHF channel allocations of the U. S. and Japan are listed in the 1966 World Radio TV Handbook (20th ed.) at 249 (attached to Report of Walter Lukas).

22. For example, Vito Brugliera has stated in more than one affidavit that "television receiver sets manufactured for sale in Japan do not differ in any significant respect, either from a technical or cost standpoint, from television receivers manufactured by Japanese manufacturers or others for sale in the United States." In another affidavit, Brugliera avers, "Monochrome and color television receivers in each market are electronically identical, function by function by virtue of the NTSC standard. That components may differ between domestic and export receivers is of little consequence from a design viewpoint." And Brugliera and Karl Horn, in their expert witness report, state:

> It is our opinion that such products are comparable at the functional, technological and manufacturing level. Any purported differ-

ences, once one understands the technical issues, are not significant.

Walter Lukas, the plaintiffs' other expert witness on technical issues, explaining the model-by-model matchups which he constructed, wrote:

> In this comparison of television receivers, the following general considerations do not materially impact upon technological comparability:
>
> (1) Minor modifications of VHF and UHF tuners and video intermediate frequency amplifiers reflect a slight variance in channel allocations for the markets in Japan and the U. S. . . . .
>
> (2) Power sources available for television receiver operation in Japan are 100 Volts, 50/60 Hz; in the U. S., 120 Volts, 60 Hz. (These voltage characteristics constitute the prevalent standard used for television receivers in those markets.)

Lukas concludes, "My opinion . . . is that such television receivers are practically identi-

ciding these summary judgment motions, we must credit these averments, as they clearly suffice to raise a genuine issue of fact. Even if we were not so bound, we have no doubt that the differences described above have little more significance technically, and are of little more professional interest to an electronic engineer, than the prices at which the receivers are sold or the nationality of their producers. Plainly, the undisputed physical differences between television receivers used in the U. S. and in Japan are merely adaptations to the technical conventions of broadcasting and of electrical power transmission in the two countries.[22A] They are closely analogous to the differences necessitated by the use of the metric system in many countries, and of the traditional units in the United States, or by the use of right-hand-drive automobiles in some countries and of left-hand-drive vehicles in the United States.

Our task, however, is to determine the *legal* significance of the undisputed physical differences. We are not concerned with the technological significance of the differences unless the legal standard which we must apply is formulated in terms of their technological significance. The legal standards which are controlling here, for reasons which are stated at great length in the remainder of this opinion, do not require us to evaluate the significance of the differences as a technical matter, or to assess the extent to which they would affect an engineer designing a television receiver. Nor do the controlling legal standards require us to evaluate the differences in cost of production which result from adaptation to the differing technical conventions of the U. S. and of Japan.[23] Instead, the pertinent legal standards require us to assess the impact of the undisputed physical differences on consumer use and marketability. To these

cal in substantially all material technological respects."

**22A.** In addition to the physical differences we have discussed, TV receivers are constructed differently to comply with legal safety standards applicable in the U. S., *see* n. 18, *supra*, and in Japan. The nature of the Japanese standards, and the physical differences which the two sets of standards necessitate, have not been developed in the record before us. Since the different safety standards render TV receivers manufactured for one market legally unmarketable in the other, this difference also supports the grant of summary judgment on the plaintiffs' 1916 Act claims with respect to television receivers.

**23.** As a result, we need not consider the record which the parties have made on the relative cost of production of television receivers for the U. S. and for Japan. Specifically, we do not consider the 1974 letter of William G. Frick and the deposition testimony of Walter C. Fisher, *see* n. 14, *supra*, concerning Zenith's plans to market U. S.-made television receivers in Japan, the investment that Zenith determined would be necessary to modify its product for the Japanese market, and the ultimate abandonment of Zenith's plans.

Defendants contend, on the basis of the Frick letter, the Fisher testimony, and Gordon Reichard's affidavit of April 16, 1979, that there are no genuine issues of fact as to differences in the relative cost of manufacturing television receivers for the Japanese and American markets and as to the investment required to

switch production facilities from one type of receiver to the other.

Reichard avers that in order to convert a color television model manufactured for the United States market so that it could be used in the Japanese market, it would be necessary to set up special production facilities, to obtain new test equipment, and to invest a minimum of $100,000 in new capital equipment. Defendants interpret the Fisher testimony and Frick letter as support for this position, since Frick concluded that "it is not economically feasible for Zenith to enter the Japanese market with Television products," and Fisher explained the reasons for that decision in his deposition testimony. Plaintiffs' affiants Brugliera, Schupp, and Mainiero state, however, that the steps which Reichard says are necessary to change from production of U. S. to production of Japanese TV receivers may or may not be necessary, depending on other economic factors, such as production volume, and technological factors. As we have previously noted, Brugliera avers in other affidavits that the differences in the cost of manufacturing products for the U. S. market or for the Japanese market are insignificant. In light of the averments of plaintiffs' affiants, we could not conclude that there are no genuine issues of fact either with respect to the relative cost of production of U. S. and Japanese products, or with respect to the investment necessary to change over production facilities from one product to the other. For the reasons stated in the text, however, we do not view these issues as material to the disposition of the summary judgment motions.

matters we now turn; again, the facts related are admitted by the plaintiffs and there is not the slightest doubt as to their veracity.

Zenith's Executive Vice President, Karl H. Horn, one of its highest officers and a member of its Board of Directors as well as an expert witness in this litigation, discussed the utility in Japan of TV sets designed for United States use, and *vice versa*, at his deposition. He admitted that a set designed for use here might be incapable of receiving any picture at all in Japan, let alone a satisfactory one, and conceded that sets designed for use in Japan cannot receive two of the three major U. S. television networks in Chicago, the situs of the deposition. Mr. Horn testified, *inter alia*:

Q. Do you know whether I could walk into a Sears Roebuck store here in Chicago and buy a Sears color television set and take it over to Tokyo and plug it in and operate it?

A. You could plug it in and you could operate it. Whether you would receive any picture at all or whether you would receive a satisfactory picture is a big question mark.

Q. Would you in good conscience suggest to anyone that he take a Sears television set as they are sold in the United States and sell it to somebody for use in Japan?

A. No. . . .

Q. Could I, assuming I were to go to Tokyo or Osaka, or any large city in Japan, and walk into the department store and purchase a television set, could I bring that set as I purchased it in Japan to this country and operate it satisfactorily?

A. . . . You do not receive the U. S. low channels, 2 through 6, but you can receive without any adjustment 9 [sic] through 13 and with adjustment 7 through 9. . . .

Q. So that without modification that set in Japan would be incapable at least of receiving two of the three major television networks in the United States in Chicago?

A. Yes.

Vito Brugliera, plaintiffs' affiant and expert witness, testified at his deposition that a TV receiver manufactured for use in Japan, if used in the United States, probably would run hot and might "overheat and go" as a result of the voltage differences.[24] He testified that it would be "ridiculous" to try to use in the U. S. a receiver manufactured for use in Japan:

Q. Would you consider it ridiculous to try to use a Japanese set in the United States?

A. Well, in that context I would say yes, because—

Q. You consider that ridiculous apart from the question of cost?

24. Mr. Brugliera testified as follows:

Q. Just a simple question. If you plugged the Japanese set in the wall, do you know what would happen here in the United States?

A. If you plugged it into the wall, it would probably operate, depending on how good their power supply circuit was. It would probably run hot. You would probably receive at least four or five channels here.

Q. How long could you operate it that way?

A. As I said, depending on how good their power supply design was.

Q. Suppose they had a poor power supply design.

A. Well, it would get hot.

Q. What would happen then?

A. You are talking about the AC line differences. In Japan it is 100 volts, 50 or 60 cycles. Here it is 120 volts, and from an engineering point of view, that is nothing.

Q. But what would happen to the set, anything?

A. As I said, depending on the power supply. Some of them might last indefinitely. Some of them might overheat and go. It is a function of individual design, but it is a minor engineering difference.

While Brugliera testified that certain Japanese TV sets might *not* "overheat and go" in the U. S., we do not require the moving defendants to demonstrate that there is no genuine issue of material fact with respect to overheating of particular specified models because the frequency difference, which applies to all TV receivers without exception, would by itself be sufficient to justify the grant of summary judgment.

A. Yes, because from a cost viewpoint, there is not that kind of difference.

Q. Apart from any question of cost or price of the Japanese set, would you consider it to be ridiculous to try to use that set in the United States?

A. In terms of, let's say, usable frequency allocations, I would have to agree with you.

Q. Because it wouldn't get all the U. S. channels, would it?

A. But that doesn't say the sets are different from a technological or cost viewpoint. That is a point I want to make very clear.

Brugliera also testified that attempted use in the United States would be a "misapplication" of the Japanese domestic TV receiver.[25] He admitted that the alterations necessary to make a TV set manufactured for one country capable of receiving all television broadcasts in the other country are beyond the capacity of the average consumer.[26]

To recapitulate: (1) a receiver designed for use in Japan would not receive most U.S. broadcasts and would be in serious danger of fatal overheating; (2) the changes necessary to make the Japanese domestic set operable in the United States could not be made by the average consumer. It is clear from the admissions of plaintiffs' witnesses that any rational consumer in the United States would prefer a television receiver manufactured for use in this country to one manufactured for use in Japan, and that he would not purchase a set manufactured for use in Japan. Similarly, any rational Japanese consumer would prefer a TV set made for use in Japan to one

25. Brugliera testified:

A. There are two things. One is misapplication of something designed for one market versus the technology and cost associated with designing for each of those specific markets.

If you want to stretch the analogy, I will grant you would be misapplying a Japanese domestic TV model by plugging it into U. S. wall outlet, but I am saying that it is not very difficult to design for either market, knowing the environment you are going to face, and that the cost differentials are miniscule. I am saying you could build the same set and just have a different module for the power supply and substitute A or B and have a different tuner package and substitute A or B, depending upon which market you were designing for.

Q. But going really to the set as it was designed for use in Japan as opposed to this set as it was designed for use in the United States, would you state that it would be a misapplication to attempt to use the one or the other in the foreign market?

A. Yes, but that is saying, for instance, do you drive a British car in the U. S.? You normally wouldn't. You could if you wanted to.

I could take a Japanese set and use what is called a variable transformer and operate it all the time.

26. Brugliera testified:

Q. But it is a different component or tuner in each set, is that right?

A. The tuners are different—well, if the tuners are click stop, you know, individual channels, they would be different; but, for instance, if you were using what we call a strip tuner, which is a mechanical tuner that has plastic strips in it that have resistors and capacitors and coils on them, you could use the mechanical housing in the electronic circuits and just interchange the strips. . .

Q. When you are talking about interchanging the strips, would that be from a lab or technical end? In other words, if you were a consumer—

A. A consumer could conceivably do it.

Q. Let's say the average consumer—

A. It would usually be a technician at a technical level because you normally don't want a customer getting inside the set.

Although Brugliera's statement that "you normally don't want a customer getting inside the set" was made during a discussion of strip tuners, we view it as of wider import. Brugliera admitted that modification of a set designed for use in Japan to make it operable in the U. S. requires at least the substitution of different tuner and power supply components. n. 25, *supra*. The record reveals no instances of television receivers which are designed so that the necessary substitution can be made without "getting inside the set." It follows from these facts and from Brugliera's statement quoted above that the necessary substitution would normally be made by a technician, and not by the consumer. We note that although we must, on these summary judgment motions, make all inferences in favor of the plaintiffs, we are not required to ignore the rules of logic. *See First National Bank of Arizona v. Cities Service, Co.*, 391 U.S. 253, 287–89, 88 S.Ct. 1575, 1591–92, 20 L.Ed.2d 569 (1968).

designed for use in the United States.[27] We conclude that television receivers manufactured for use in Japan are unusable by consumers in the United States, that they are unmarketable in the U. S., and, *a fortiori*, that the receivers are not commercially interchangeable.

D. *Physical Differences Between U.S. and Japanese Non-Television Consumer Electronic Products; Effects Thereof on Consumer Use and Marketability*

In addition to its claims with respect to television receivers, plaintiff Zenith Radio Corporation also complains of actionable dumping of radios, phonographs, and tape and cassette recorder/players. National Union Electric Corporation, the other plaintiff in this litigation, has limited its complaint to television receivers. Although the record with respect to similarities and differences between non-television consumer electronic products sold in the U. S. and in Japan is far less voluminous than the corresponding record with respect to TV receivers,[28] two differences are undisputed. As before, all the facts we relate are admitted by the plaintiff.

All consumer electronic products which are not solely battery-operated must be designed to accommodate the differences in the available power supply in Japan and the U.S. As we have explained, the voltage and frequency of alternating current differs in the electrical power systems of the two countries. Like television receivers, other consumer electronic products which operate on alternating current include a power supply component which transforms the available external electrical power into direct current at a voltage appropriate for the internal workings of the product. The electric motors in some consumer electronic products, particularly phonographs and tape recorders, may be driven by the internal power supply or may be driven directly by alternating current from the external power source. Adaptation of a product designed for use in the United States for use in Japan, or *vice versa*, requires the alteration of the power supply component and of the electric motor if it is driven directly by the external power source.

If radios, phonographs, and tape and cassette recorders designed for use in the Unit-

---

27. *See also* n. 22A, *supra.*

28. The only affidavit submitted by defendants in support of the summary judgment motions on Zenith's 1916 Act claims with respect to non-television products is that of Harry E. Ruther, Jr., an electrical engineer employed by Sears, Roebuck and Co. An affidavit of Vito Brugliera responds to Ruther on behalf of Zenith. The expert witness report of Brugliera and Karl Horn addresses itself to the comparability of non-television products and explains the construction of Zenith's model-by-model matchups of allegedly comparable products. The plaintiff's FPS sets forth Zenith's dumping claims for non-television products, vol. 17 at 8149–64, and includes voluminous price comparison reports submitted as Appendix J. The price comparisons are based on model-by-model matchups listed in the FPS at 8151–64. According to the FPS, those matchups are to be authenticated by the testimony of Horn and Brugliera, and consequently we assume that the matchups were constructed according to the methods stated in the Horn/Brugliera expert witness report. As a result, the validity of Zenith's non-television dumping claims as set forth with preclusive effect in the FPS is dependent on the validity of the model-by-model matchups constructed by Horn and Brugliera,

which in turn depends on whether or not we share their assumption that the physical differences recounted in the text are legally significant. *See* pp. 1203 -1204, *supra.*

The Ruther and Brugliera affidavits, the Horn/Brugliera report, and the model-by-model matchups in the FPS are all concerned solely with radios, phonographs, and tape and cassette recorders. None of these sources include stereo and audio instruments or electronic components, even though these two categories of electronic products were included in Zenith's complaint and counterclaim. We have previously ruled that Zenith has abandoned its dumping claim with respect to electronic components by failing to include them in its previous submission of model-by-model comparisons. See Pretrial Orders No. 146 at p. 233 (Feb. 27, 1979); No. 165 at pp. 76 & 97–98 (Apr. 23, 1979); No. 222 at 153–57 (Jan. 16, 1980). Since stereo and audio instruments are not mentioned in any of the evidentiary sources which we have consulted in deciding the instant motions, we do not deal with them here. At a subsequent pretrial conference we will take up the question whether or not stereo and audio instruments remain in this case. *See* n. 63, *infra.*

ed States were operated from the external power sources available in Japan, the audio output of all such products would include an objectionable hum. Moreover, the motors of phonographs and tape and cassette recorders which are powered by external alternating current would operate at a slower speed in Japan, causing pronounced sound distortion. Consumer electronic products which are operated by batteries do not encounter these problems of satisfactory operation.

Another difference between products used in the U. S. and those used in Japan is specifically relevant to radios which receive FM transmissions. The standards for encoding audio information on a radio frequency for FM broadcast are identical in both countries. As a result, the electronic circuits used for processing FM signals in a radio receiver may be identical in both countries. The radio frequency bands assigned to FM radio transmission are different, however. In the United States, FM broadcasts are made on a frequency band of 88 to 108 Mhz. In Japan such broadcasts are made on a frequency band of 80 to 90 Mhz. Radios which receive FM transmissions which are designed for use in one country cannot be operated satisfactorily in the other country in that they can only receive broadcasts on the narrow part of the band, 88 to 90 Mhz, on which transmissions are made in both countries.

The plaintiff's affiant and witness aver that these differences are of no technical significance and do not affect manufacturing costs.[29] For the reasons stated at p.

1207, *supra* and at great length *infra,* we do not view the technical significance of the differences as a decisive factor in the disposition of these summary judgment motions. Instead, the relevant factor is the effect of the undisputed differences on consumer use and marketability. It is clear that any rational consumer would prefer products which do not produce an objectionable hum or other sound distortion, and would prefer radios which can receive all broadcasts in his country on the FM band. Therefore we conclude that all consumer electronic products which are not solely battery-operated, and all radios which receive FM transmissions whether or not battery-operated, which are designed for use in the United States, are unusable to consumers in Japan, are unmarketable in Japan, and, *a fortiori*, are not commercially interchangeable with products designed for use in Japan.[30]

Having stated the undisputed physical differences between consumer electronic products manufactured for sale in the U. S. and those manufactured for sale in Japan, and having evaluated the impact of those differences on consumer use and marketability, we now turn to our analysis of the Antidumping Act of 1916.

IV. ANALYSIS OF THE ANTIDUMPING ACT OF 1916

A. *Introduction*

The observation that the Antidumping Act of 1916 has not played a prominent role in the American jurisprudence is an egregious understatement. In fact, until the

29. Vito Brugliera states that "radios, phonographs and open reel and cassette tape recorders manufactured for sale in Japan do not differ in any significant respect either from a technical or cost standpoint from similar items manufactured by Japanese manufacturers or others for sale in the United States." He avers that to prevent objectionable hum "only minor technical modifications are necessary," that the problem of motor speed may be solved by "a simple mechanical modification" and that the differences in the FM band are "of no technical significance." The Horn/Brugliera report observes, *e. g.*, that the differing voltage and power frequency of alternating current in the U. S. and Japan is "easily accommodated" in tape recorders "by interchanging two components:

the electric drive motor and power transformer," and concludes that the products are "technically comparable."

30. The factual record with respect to non-television products does not include averments as to the effects of the operation in the *U. S.* of products designed for use in *Japan.* Thus we cannot add here, as we did in our discussion of TV receivers, the words "and vice versa." This difference is immaterial, however, for the fact that the differences stated in the text affect consumer use and marketability in Japan is sufficient by itself to preclude comparison of the products for purposes of the 1916 Act.

**1212**

1970's the Act was mentioned in only one reported decision, and that addressed a dispute over the availability of pretrial discovery and did not reach the merits. *H. Wagner & Adler Co. v. Mali*, 74 F.2d 666 (2d Cir. 1935). Apparently there have been four attempts to enforce the criminal provisions of the Act, but none of them has been successful and none has given rise to a reported judicial decision. Marks, *United States Antidumping Laws—A Government Overview* 43 Antitrust L.J. 580, 581 (1974). It may well be that, other than the *Mali* case cited above, there was, prior to the 1970's, nary an action brought by civil plaintiffs invoking the 1916 Antidumping Act.

Nor has the Act occasioned much scholarly commentary. With the single exception noted, we have searched the antitrust treatises in vain for reference to it. That exception is a recent treatise on the application of antitrust law to foreign trade, which dispatches the Act in the following paragraph:

> The present Antidumping Act of 1921 superseded the Antidumping Act of 1916 which provided criminal penalties and a treble damage action for dumping with intent to restrain or monopolize trade or to destroy, substantially injure, or prevent the establishment of a U. S. industry. The earlier law, while still intact, has been of no significance. Not only has the 1921 Act taken its place, but the specific intent required posed a very difficult enforcement problem. However, a private treble damage case brought under the 1916 Act in 1971 is pending as of this writing.

W. Fugate, Foreign Commerce and the Antitrust Laws 412 (1973) (footnotes omitted). The "private treble damage case" mentioned in the above quotation is the instant litigation.

The Act has been construed in an earlier decision in this litigation, in which Judge A. Leon Higginbotham, Jr., our predecessor in the case, upheld the validity of the Act against constitutional attack on grounds of vagueness. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 251 (E.D.Pa.1975). Judge Higginbotham there analyzed the language of the statute and determined that the challenged terms have a clear and ascertainable meaning. *Id.* at 255–58. Besides the instant litigation, the Act has also been interpreted in three other reported cases. In *Bywater v. Matsushita Electric Co.*, 1971 Trade Cas. ¶ 73,759 (S.D.N.Y.1971), and in *Schwimmer v. Sony Corp. of America*, 1979–1 Trade Cas. ¶ 62,632 (E.D.N.Y.1979), the courts granted summary judgment for the defendants on the issue of standing. The courts observed that the language of the provision of the 1916 Act which authorizes private treble damage actions is substantially the same as the language of 15 U.S.C. § 15, which authorizes treble damage actions for violations of the antitrust laws, and held that the rules of standing applicable under § 15 should also apply in suits brought under the 1916 Act. Thus neither opinion tells us anything about the meaning of the Act itself. And in *Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384, 408–09 (D.Del.1978), Judge Murray M. Schwartz decided only that the Act has no application to goods which are manufactured exclusively for importation to the United States, and are not commonly sold either in the country of their manufacture or in third countries. Accordingly, he dismissed the plaintiff's claim that electric golf carts were imported from Poland at prices which violated the Act, since the carts were sold only in the United States.

While we find the analysis in these decisions useful, and will refer to it in our discussion, determination of the summary judgment motions which are presently before us requires a more extensive inquiry into the legislative and social history of the Antidumping Act of 1916 than has heretofore been undertaken. This will aid in our threshold task, which is to ascertain whether the Act was intended to be part of the corpus of antitrust law, or whether the Act was intended to be "protectionist" legislation, as that term is used in discussion of tariff barriers to free trade. This is a most important endeavor, for the character of the statute is of salient concern in its construction. We also seek guidance, of course, on the narrower issues before us.

Our *modus procedendi* will be as follows. We will first examine the language of the statute itself. Next we will sketch the relevant political and legal history of the era, before the United States entered World War I, in which the Act was passed. As the Supreme Court recently observed, "courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it." *Leo Sheep Co. v. United States*, 440 U.S. 668, 669, 99 S.Ct. 1403, 1405, 59 L.Ed.2d 677 (1979), quoting *United States v. Union Pacific Railroad Co.*, 91 U.S. 72, 79, 23 L.Ed. 224 (1875). In view of the 64 years which have passed since enactment of the statute, we will "recur to the history of the times" in somewhat more detail than is customary in the construction of more recent statutes which arise from a more familiar social and political background. After the background is sketched, we will examine the legislative history immediately pertinent to the enactment of the Antidumping Act. Finally, we will examine the essential differences between the Antidumping Act of 1916 and the Antidumping Act of 1921.

### B. *The Statutory Text*

The term "dumping" has been defined as "price discrimination between purchasers in different national markets." J. Viner, Dumping: A Problem in International Trade 4 (1966 ed.). *See Zenith, supra*, 402 F.Supp. at 259. Thus, to restate the obvious, the Antidumping Act of 1916 is a prohibition of international price discrimination. The Act mandates a comparison of the price at which articles are imported or sold within the United States with the "actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production." [31] The Act is violated if the price in the United States is "substantially less" than the foreign "actual market value or wholesale price," after freight, duty, and incidental expenses are added thereto, and if the proscribed price discrimination is undertaken with the intent of injuring domestic industry.

### 1. *Similarities to Antitrust Statutes*

As a price discrimination statute, the Antidumping Act of 1916 is functionally similar to the price discrimination statutes which are applicable to domestic business. Section 2 of the Clayton Act makes it unlawful "to discriminate in price between different purchasers of commodities." 38 Stat. 730 (1914).[32] This provision was in force at the time of the passage of the 1916

---

**31.** 15 U.S.C. § 72 (quoted in full at n. 4, *supra*). The Act also permits "actual market value or wholesale price" to be calculated with respect to the principal markets "of other foreign countries to which [the articles] are commonly exported." *Id.* However, this provision is of no significance in the instant litigation since the plaintiffs have not sought to compare U. S. prices with values derived from sales of consumer electronic products in any nation other than the country of their production, Japan. In our discussion, we will frequently abbreviate the statutory language quoted in the text by referring to the "actual market value."

**32.** Section 2 of the Clayton Act, as enacted in 1914, provides in full as follows:

Sec. 2. That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities, which commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce: *Provided*, That nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition: *And provided further*, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade. 38 Stat. 730 (1914).

Antidumping Act and, as amended by the Robinson-Patman Act of 1936, is still in force. 15 U.S.C. § 13.[33] The Supreme Court has held that the phrase "discriminate in price" embraces all differences in prices charged to different purchasers. *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). However, Section 2 of the Clayton Act, both before and after the Robinson-Patman amendments, is applicable only if both "legs" of the alleged price discrimination involve commodities which are "sold for use, consumption, or resale within the United States." *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 244 (E.D.Pa.1975).[34] Hence the Clayton Act and the Robinson-Patman Act do not apply to international dumping, which involves price discrimination between commodities sold for use in the United States and commodities sold for use in foreign countries. *See id.* at 249.

In addition to its functional similarity with Section 2 of the Clayton Act and the Robinson-Patman Act, the Antidumping Act of 1916 bears other significant resemblances to the antitrust statutes. As the courts noted in *Bywater, supra,* and *Schwimmer, supra,* the standing and damage provisions of the 1916 Act are essentially the same as those applicable to the antitrust laws under section 4 of the Clayton Act, 15 U.S.C. § 15. The clause of the 1916 Act which creates criminal penalties is virtually identical to, and specifies the same penalties as, the corresponding clauses of the Sherman Antitrust Act as then in force,

**33.** Section 1 of the Robinson-Patman Act, 49 Stat. 1526 (1936), made extensive amendments in section 2 of the Clayton Act; the amended section is often referred to simply as "the Robinson-Patman Act," since the original version of section 2 of the Clayton Act is no longer operative. In our discussion, we refer to the "Robinson-Patman amendments" and the "Robinson-Patman Act" interchangeably, depending on the context. Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, which is the only portion of the amended section 2 which we consider in this opinion, reads in full as follows:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: *Provided, however,* That the Federal Trade Com-

mission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: *And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided further,* That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.
15 U.S.C. § 13(a).

**34.** Concomitantly, in his opinion dealing with the constitutionality of the 1916 Act as against an attack for vagueness, Judge Higginbotham observed:

As I read the Act, it forbids regular, continued price discrimination between purchasers in *different national markets* whenever the discrimination is motivated by a desire to destroy competition. . . .
402 F.Supp. at 259 (emphasis added).

26 Stat. 209 (1890). And the intent clause of the 1916 Act speaks in antitrust terms, limiting the scope of the statutory ban to price discrimination practiced "with the intent of destroying or injuring industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States." [35] We conclude then, on the basis of the statutory text, that the 1916 Act is an antitrust, not a protectionist statute. That conclusion is strongly corroborated by the political and legal history of the relevant era, and the legislative history of the 1916 Act, both of which are discussed *infra*.

### 2. Incorporation of Customs Appraisement Terminology

On the other hand, in one important respect, the language of the 1916 Act follows contemporary customs terminology. At the time of enactment of the 1916 Antidumping Act, the phrase "actual market value or wholesale price" had a specialized meaning in the customs law of the United States, as both Judge Higginbotham and Judge Schwartz have recognized. *See Zenith, supra*, 402 F.Supp. at 257; *Pezetel, supra*, 461

F.Supp. at 409. In the Tariff Act of 1913, § III, ¶ R, 38 Stat. 189, Congress directed that customs duties based on the value of imported merchandise should be assessed upon "the actual market value or wholesale price thereof, at the time of exportation to the United States, in the principal markets of the country from whence exported." [36] The Antidumping Act of 1916 incorporates this entire phrase, with only one substantive change, which is irrelevant for our present purposes. The 1916 Act provides that the United States price of imported articles should be compared with "the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production." [37] The language of the 1913 Act and the 1916 Act in this respect are essentially identical.

The phrase "actual market value or wholesale price" had a long history in customs law prior to 1916. The phrase had been employed in customs appraisement statutes since the Tariff Act of 1842, § 16, 5 Stat. 563. *See generally* R. Smith, Customs Valuation in the United States 86–138 (1948). The definition of that phrase which was stated in ¶ R of the 1913 Tariff Act was essentially the same as the definition

---

**35.** It is also of some significance that the Act was introduced and passed under the heading "Title VIII—Unfair Competition." *See* pp. 1220–1221, *infra*.

**36.** Whenever in our discussion we refer to "¶ R" of the Tariff Act of 1913, we mean ¶ R of Section III of that Act, which is here reproduced in full:

"R. That whenever imported merchandise is subject to an ad valorem rate of duty, or to a duty based upon or regulated in any manner by the value thereof, the duty shall be assessed upon the actual market value or wholesale price thereof, at the time of exportation to the United States, in the principal markets of the country from whence exported; that such actual market value shall be held to be the price at which such merchandise is freely offered for sale to all purchasers in said markets, in the usual wholesale quantities, and the price which the seller, shipper, or owner would have received, and was willing to receive, for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities, including the value of all cartons, cases, crates, boxes, sacks,

casks, barrels, hogsheads, bottles, jars, demijohns, carboys, and other containers or coverings, whether holding liquids or solids, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, and if there be used for covering or holding imported merchandise, whether dutiable or free, any unusual article or form designed for use otherwise than in the bona fide transportation of such merchandise to the United States, additional duty shall be levied and collected upon such material or article at the rate to which the same would be subjected if separately imported. That the words "value," or "actual market value," or "wholesale price," whenever used in this Act, or in any law relating to the appraisement of imported merchandise, shall be construed to be the actual market value or wholesale price of such, or similar merchandise comparable in value therewith, as defined in this Act.
38 Stat. 189 (1913).

**37.** *See* n. 31, *supra*.

provided in § 19 of the Customs Administrative Act of 1890, 26 Stat. 139. That section of the 1890 Act was left untouched by the Tariff Act of 1897, § 32, 30 Stat. 211, which amended other sections of the 1890 Act. It was reenacted with minor changes and renumbered as § 18 in the Tariff Act of 1909, 36 Stat. 101. While the 1909 Tariff Act made several modifications in the language of § 19 of the Customs Administrative Act of 1890, only one change is pertinent here. The 1909 Act stated explicitly for the first time what was implicit in prior customs practice, i. e., that actual market value could be determined on the basis of "similar merchandise comparable in value" with the goods under appraisement, thereby codifying prior practice. *See* pp. 1229–1230, *infra.*

What is important to note for our present purposes is that the meaning of "actual market value or wholesale price," a function of statutory definition and customs practice, remained essentially unchanged in customs appraisement law from 1890 until after the enactment of the Antidumping Act of 1916. In our discussion we refer to the 1913 Tariff Act because that was the customs statute which was in force when the 1916 Act was passed.

Paragraph R of the 1913 Tariff Act specifically prescribes the definition of "actual market value" stated therein apply "in any law relating to the appraisement of imported merchandise." *See* n. 36, *supra.* Insofar as the 1916 Antidumping Act requires a determination of the value of imported merchandise, it is such a law. Moreover, Congress expressed in 1921 its understanding that the 1916 Antidumping Act was a "law relating to the appraisement of imported merchandise." In § 303(a) of the Emergency Tariff Act of 1921, Congress made a new customs appraisement provision, *see* n. 59, *infra,* applicable "in any law of the United States in existence at the time of the enactment of this Act *relative to the appraisement of imported merchandise (except . . . section 801 of the Revenue Act of 1916*)." 42 Stat. 16 (1921) (emphasis added). Section 801 of the Revenue Act of 1916 is the Antidumping Act of

1916, *see* pp. 1220–1221, *infra.* The inclusion of the 1916 Act among the exceptions enumerated in § 303(a) of the Emergency Tariff Act of 1921 demonstrates that Congress considered the 1916 Act a law "relative to the appraisement of imported merchandise" to which the section would otherwise have applied.

We note, however, that even if ¶ R of the 1913 Tariff Act were not explicitly made applicable to all laws "relating to the appraisement of imported merchandise," we would still construe the language "actual market value" in the 1916 Antidumping Act as a reference to ¶ R and an incorporation thereof. For, by incorporating in the 1916 Act a phrase from contemporary customs law, Congress must have intended to direct that the appraisement of imported merchandise under the 1916 Act follow the principles set forth in the Tariff Act of 1913. "[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary." *Lorillard v. Pons,* 434 U.S. 575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978) (citations omitted).

We will explain in detail below, *see* pp. 1229–1230 & 1234–1239, *infra,* how and why the appraisement principles of the 1913 Tariff Act permitted recourse to sales in a foreign country of merchandise which was "similar" but not identical to the merchandise under appraisement. It is our view that this rule was incorporated into the 1916 Antidumping Act by the use therein of customs phraseology drawn from the 1913 Tariff Act. However, the permissible degree of similarity was not unlimited. *See* discussion *infra.* Although the limits of the concept of similarity of goods for customs appraisement purposes were not clear in 1916, the legal standard was clarified in a line of customs decisions beginning in 1928 and continuing to the present. For the reasons to be stated in due course, we find the subsequent customs decisions applicable in the interpretation of the 1916 Act. As applied to the uncontested facts before us,

and for the reasons set forth below, the standard of similarity set forth in those decisions compels us to grant summary judgment for the defendant on plaintiff's 1916 Act claims.

Although, in our view, the pending summary judgment motions might be disposed of solely because of the consequences which flow from the incorporation in the 1916 Act of the appraisement standards of the 1913 Tariff Act, we also seek guidance from the legislative history of the Antidumping Act of 1916. Before turning to the legislative history, however, we must first review the background of the statute in the law and politics of the era when it was enacted.

### C. Antitrust and Tariff Law and Politics in the First Wilson Administration

The Antidumping Act was approved on September 8, 1916, during the last months of the first administration of President Woodrow Wilson. The Democratic Party had a majority in both houses of Congress during the Sixty-Third Congress of 1913–15 and the Sixty-Fourth Congress of 1915–17.[38] The Democratic Congresses, consonant with Party tradition in that era, were vigorously opposed to anticompetitive and monopolistic practices. The Democratic Party platform of 1912 stated the party's position on monopoly as follows: [39]

A private monopoly is indefensible and intolerable. We therefore favor the vigorous enforcement of the criminal as well as the civil law against trusts and trust officials, and demand the enactment of such additional legislation as may be necessary to make it impossible for a private monopoly to exist in the United States.

We favor the declaration by law of the conditions upon which corporations shall be permitted to engage in interstate trade, including, among others, the prevention of holding companies, of interlocking directors, of stock watering, of discrimination in price, and the control by any one corporation of so large a proportion of any industry as to make it a menace to competitive conditions. . .

We regret that the Sherman anti-trust law has received a judicial construction depriving it of much of its efficiency and we favor the enactment of legislation which will restore to the statute the strength of which it has been deprived by such interpretation.

The Sixty-Third Congress translated its antimonopoly fervor into law with the enactment in 1914 of the Federal Trade Commission Act, 15 U.S.C. § 41 et seq., and the Clayton Act, 15 U.S.C. § 12 et seq. As we have already noted, section 2 of the Clayton Act prohibited price discrimination, a practice which was then viewed as an important contributor to the growth of monopoly. See H.R.Rep.No.627, Pt. 1, 63d Cong., 2d Sess. 8–9 (1914). The section was not intended to apply to international commerce. Id. at 7. See Zenith, supra, 402 F.Supp. at 248–49.

The Democratic Party's opposition to monopoly was matched by its strong support for international free trade. Adhering to their long-established position, the Democrats demanded "a tariff for revenue only." On this issue, the Democratic Platform of 1912 stated: [40]

We declare it to be a fundamental principle of the Democratic party that the Federal government, under the Constitution, has no right or power to impose or collect tariff duties, except for the purpose of revenue, and we demand that the collection of such taxes shall be limited to the necessities of government honestly and economically administered.

The high Republican tariff is the principal cause of the unequal distribution of wealth; it is a system of taxation which

---

38. Congressional Quarterly, Inc., Guide to Congress 182–A (2d ed.1976). The Democrats lost control of both houses of Congress to the Republicans in the election of 1918, and lost the Presidency as well in the election of 1920.

39. National Party Platforms, 1840–1956, at 169 (K. Parker & D. Johnson, eds.) (1956) [hereinafter cited as "Platforms"].

40. Id. at 168–69.

makes the rich richer and the poor poorer; under its operations the American farmer and laboring man are the chief sufferers; it raises the cost of the necessaries of life to them, but does not protect their product or wages. . . .

We favor the immediate downward revision of the existing high and in many cases prohibitive tariff duties, insisting that material reductions be speedily made upon the necessaries of life. Articles entering into competition with trust-controlled products and articles of American manufacture which are sold abroad more cheaply than at home should be put upon the free list. . . .

. . . We appeal to the American people to support us in our demand for a tariff for revenue only.

The Democrats viewed the protective tariff issue as closely related to their efforts to limit the power of perceived monopolies. For example, their 1912 platform proposed that "[a]rticles entering into competition with trust-controlled products" be put on the free list, *i. e.* admitted without the payment of any tariff duties. More broadly, the Democrats believed that the protective tariffs then in force insulated domestic trusts from legitimate foreign competition. Woodrow Wilson stated their position in a 1912 campaign speech:

The men who created the monopoly . . . are the men who have taken advantage of the protective tariff to get together to make great combinations of industry to shut out competition and to make sure that the prices are in their own control.

W. Wilson, *A Crossroads of Freedom: 1912 Campaign Speeches of Woodrow Wilson* 156 (J. Davidson, ed.) (1956). *See* F. Taussig, *The Tariff History of the United States*, 362 (1931, reprinted 1967).

The Tariff Act of 1913, known as the Underwood Tariff Act, was adopted a few months after President Wilson and the new Congress were inaugurated. It brought substantial reductions in tariff rates, as well as the reenactment in ¶ R of the ap-

praisement provisions which we have already quoted, which were derived from existing legislation. As stated in the House Report, a principal purpose of the Tariff bill was:

[T]o introduce in every line of industry a competitive tariff basis providing for a substantial amount of importation, to the end that no concern shall be able to feel that it has a monopoly of the home market gained other than through the fact that it is able to furnish better goods at lower prices than others.

H.R.Rep. No. 5, 63rd Cong., 1st Sess. at XVII (1913).

The Underwood tariff bill as passed in the House of Representatives included an antidumping clause which authorized the assessment of antidumping duties, but not a private cause of action, and included no injury or intent requirement. *Id.* App. at 454. The Senate Finance Committee struck out this antidumping provision, expressing its fear that the provision might be used by "an unfriendly administration" to increase tariff rates. S.Rep. No. 80, 63d Cong., 1st Sess. at 31 (1913). *See also* 53 Cong.Rec. 10619 (1916) (Statement of Rep. Switzer). The House concurred in this Senate amendment. H.R.Rep. No. 86, 63d Cong., 1st Sess. at 28 (1913) (Conference Report).

The Republican minority of this era supported the principle of protective tariffs and resisted the Democrats' efforts to promote free trade. In its 1912 platform, the Republican Party stated: [41]

We reaffirm our belief in a protective tariff. The Republican tariff policy has been of the greatest benefit to the country, developing our resources, diversifying our industries, and protecting our workmen against competition with cheaper labor abroad, thus establishing for our wage-earners the American standard of living. The protective tariff is so woven into the fabric of our industrial and agricultural life that to substitute for it a tariff for revenue only would destroy many industries and throw millions of our people out of employment.

---

41. *Id.* at 184–85.

However, the Republicans were unable to defend their tariff policy from Democratic attack until the adoption of the Emergency Tariff Act of 1921 and the Tariff Act of 1922, when they raised tariff rates sharply.

On June 28, 1914, the assassination in Sarajevo of Archduke Franz Ferdinand of Austria-Hungary set off a chain of events that within a few months embroiled all Europe in World War I. Since European industries were incapacitated, the war "served as protection more effective than any tariff legislation could possibly be." F. Taussig, *supra*, at 448. Not only was importation of competing European products impossible, but American goods which had previously been made only under the shelter of high duties were exported heavily to neutral markets abroad.[42]

Despite the wartime prosperity of American industry, government officials and legislators of both parties feared ruinous foreign competition after the war ended. They anticipated that the European industries, in an effort to revive themselves, would resort to unfair and predatory methods of competition. The prevailing fear of unscrupulous postwar competition from European industry was expressed by Secretary of Commerce William Redfield in his 1915 annual report:

> "Unfair competition" is forbidden by law in domestic trade, and the Federal Trade Commission exists to determine the facts and takes steps to abate the evil wherever found. The door, however, is still open to "unfair competition" from abroad which may seriously affect American industries for the worse. It is not normal competition of which I speak, but abnormal. It is a destructive type of the industrial struggle, intended to put out of being the forces opposed to it that the victor may exploit the field at will. The methods used are not those of legitimate commerce, but those of commercial offense. They aim not at development, but at conquest. When the war shall close, the public control of railways in foreign lands, the semiofficial chambers of commerce, the publicly fostered organizations which control great industries in some countries, will all exist and will all be used in an effort to recover lost commerce. The growth in the United States of industries which may menace large markets heretofore controlled from abroad will not be permitted if public and semipublic forces acting together in foreign countries can prevent it. The outreach of American industries, nay their very existence in our own land in some cases, will be resisted to the full and every stratagem of industrial war will be exerted against them. Expecting this, we must prepare for it. If it shall pass beyond fair competition and exert or seek to exert a monopolistic power over any part of our commerce, we ought to prevent it.

Annual Report of the Secretary of Commerce 43 (1915). Secretary Redfield continued by proposing legislative remedies for the problem, pointing out, however, that the proposed remedies should not restrain normal international competition:

> [T]he question may be said not to be whether we shall prevent such attacks but how they shall be prevented, while welcoming, indeed promoting, that normal ebb and flow of legitimate commerce between our land and all others which will provide for our people the security against exaction which is insured by reasonable competition. . . .

War Time and After, 21–2 (1919). Total exports nearly doubled between 1915 and 1916. *Historical Statistics of the United States, Colonial Times to 1970*, H.R.Doc. No. 93–78, 93rd Cong., 1st Sess. 884 (1973). The surplus balance of trade in 1916 rose 182.4% over the level of the 1915 surplus trade balance. J. Williamson, American Growth and the Balance of Payments, 1820–1913, 257 (Appendix B, Table B–1) (1964).

---

42. F. Taussig, *supra*, at 448–49. By the end of 1915, there was practically no unemployment except among the chronic indigent. H. Siebert & Co., The Business and Financial Record of World War Years 44–45 (1939, reprinted 1975). By 1916, "both the country's internal and its external trade reached proportions never previously witnessed." G. Fite & J. Reese, An Economic History of the United States 101 (1973). *See also*, Culbertson, Commercial Policy in

I should prefer . .. . to deal with [the problem] by a method other than tariffs, classing it rather as an offense similar to the unfair domestic competition we now forbid.

Among the Secretary's proposals was the enactment of an antidumping law:

I also recommend that legislation supplemental to the Clayton Antitrust Act be enacted which shall make it unlawful to sell or purchase articles of foreign origin or manufacture where the prices to be paid are materially below the current rates for such articles in the country of production or from which shipment is made, in case such prices substantially lessen competition on the part of the American producers or tend to create a monopoly in American markets in favor of the foreign producer. . . .

This proposal was apparently the precursor of the Antidumping Act of 1916.

Although we have discovered no historical evidence *directly* linking Secretary Redfield's proposals to the drafting of the 1916 Antidumping Act, the circumstantial evidence is strong. In addition to an antidumping provision "supplemental to the Clayton Antitrust Act," Secretary Redfield also recommended legislation outlawing the sale of imported articles "conditioned upon the purchaser thereof not using or dealing in wares produced or sold by the competitors of the manufacturer or seller." Annual Report of the Secretary of Commerce 43 (1915). An antidumping provision and a provision following Redfield's second recommendation were introduced by the Chairman of the House Ways and Means Committee on July 1, 1916, 53 Cong.Rec. 10372, as part of the bill for the Revenue Act of 1916. *See* pp. 1220–1221, *infra.* As introduced, the bill included only those two provisions under the heading "Unfair Competition." *See* H.R.Rep. No. 922, 64th Cong., 1st Sess. 9–10 (1916). As enacted, the two provisions are codified at 15 U.S.C. § 72 and § 73 respectively. The antidumping provision at 15 U.S.C. § 72 is the Antidumping Act of 1916.

In addition to the preceding analysis of the bill as introduced, there is other circumstantial evidence linking the 1916 Antidumping Act to Secretary Redfield's proposal. A member of the Republican opposition stated during the debate on the Revenue Act of 1916 that the Democratic majority supported the antidumping provision to counteract "the ruinous effect of the Underwood tariff law, which Secretary Redfield warns the majority is sure to come about as soon as the war in Europe is over." 53 Cong.Rec.App. 1415 (1916) (statement of Nelson E. Matthews, R–Ohio). Furthermore, Professor Jacob Viner, an eminent contemporary authority on international trade, viewed Secretary Redfield's report as the precursor of the 1916 Antidumping Act. Explaining the origins of the Act, he wrote:

The Wilson administration, while showing itself wholly sympathetic with the desire for adequate protection against unfair foreign competition, was determined that it should not be employed to build up sentiment for an upward revision of the existing tariff act. It therefore recommended that any measure adopted to meet the problem should be divorced from customs legislation and should take the form of a further extension to those engaged in the import trade of the restraints against unfair competition which had been imposed on domestic commerce.[1]

[1] Cf. the recommendations of Mr. Redfield, Secretary of Commerce in Report of the Department of Commerce, 1915, p. 43; . . .

Congress followed the recommendations of the administration. . . .

J. Viner, *Dumping: A Problem in International Trade* 242–43 (1923, reprinted 1966).

We thus have seen that the political and legal history of the era supports our conclusion from the statutory text that the 1916 Act was an antitrust based unfair competition law, not a protectionist one.

D. *Legislative History of the Antidumping Act of 1916*

The Antidumping Act of 1916 was enacted as section 801 of the Revenue Act of 1916, 39 Stat. 756. The Revenue Act was primarily intended to defray the cost of

military preparedness related to the European war and skirmishes on the Mexican border, and to finance a projected federal deficit of more than $200 million for the fiscal year ending June 30, 1917. H.R.Rep. No. 922, 64th Cong., 1st Sess. 1–2 (1916); S.Rep. No. 793, 64th Cong., 1st Sess. 1–2 (1916). The Revenue Act contained provisions addressing a wide variety of subjects, including:

1. A revision of the income tax law, first enacted in 1913, and an increase in the income tax rates;

2. The imposition of the first federal estate tax;

3. The levy of a special tax on the manufacturers of munitions;

4. The imposition of miscellaneous and special excise taxes on alcoholic beverages, tobacco, and other products and activities;

5. The adoption of temporary protective tariff rates favoring domestic dye manufacturers;

6. A revision in the tariff rates for printing paper;

7. The creation of the United States Tariff Commission to study the operation of the customs laws; and

8. Prohibitions against "unfair competition" by importers, including the provision now known as the Antidumping Act of 1916.

One member of the House of Representatives commented, "Since I have been in Congress I do not remember any bill which has dealt with such a variety of subjects." 53 Cong.Rec. 10528 (1916) (statement of Mr. Longworth).

The Revenue Act was introduced on July 1, 1916, *id.* 10372, and was presented to and approved by President Wilson little more than two months later on September 8, 1916, *id.* 14157. The antidumping clause, § 801, was one of five substantive provisions enacted in the Revenue Act under "Title VIII—Unfair Competition." The antidumping provision was passed in essentially the same form in which it was introduced by Representative Claude Kitchin (D–North Carolina), the Chairman of the House Ways and Means Committee. The discussion of the antidumping clause in the House Report reads in full as follows:

In order that persons, partnerships, corporations, and associations in foreign countries, whose goods are sold in this country, may be placed in the same position as our manufacturers with reference to unfair competition, your committee recommends:

(1) The adoption of a provision making it unlawful for a person, partnership, corporation, or association to import and systematically sell any article at a price substantially less than the actual market value or wholesale price of such article at the time of exportation, with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States; . .

H.R.Rep. No. 922, *supra*, at 9–10. The Senate Report made no mention of the antidumping clause.

Congressional debate on the Revenue Act was dominated by Republican cries for high protective tariffs and Democratic rejoinders lauding the benefits of low tariffs and direct taxation as exemplified by the pending income and estate taxes. *See, e. g.,* 53 Cong.Rec. 10579–82 (1916) (Statement of Rep. Moore, R–Pa.). There was very little debate on the antidumping clause, and there were no references to the specific issue presently before us: the comparability of articles sold in the United States with articles sold in foreign countries.

The floor debates on the antidumping clause reveal that the motivation for the clause was the widespread fear of unfair competition from European manufacturers after the end of hostilities. The remarks of Representative Saunders (D–Virginia) were typical:

Another feature of interest in this bill is the clause containing the antidumping provisions, designed to restrict undesir-

able foreign importations. . . . This country is likely to be confronted with a flood of cheap foreign manufactured products on the restoration of peace. In the effort to take over the trade which the wise legislation of the past four years has enabled our manufacturers to secure in every portion of the globe, our competitors in Europe will be likely to resort to cut throat competition under the urge of imperious necessity. Every ounce of energy in those countries is now directed toward keeping the machinery of war in motion, and all their business is related to the output of the munition factories. But when the wheels of these factories cease to turn, and the inevitable time of adjustment arrives, the foreign manufacturers of commercial wares must have business, profitable business if possible, but if not profitable, then business on any terms that will bring subsistence to the families of thousands of laborers who will turn from the forging of cannon, and the making of high explosives, to the conversion of swords and spears into the implements of prosaic toil.

53 Cong.Rec.App. 1911 (1916). These sentiments were widely shared among legislators of both parties. *See, e. g.* 53 Cong.Rec. 10531 (1916) (statement of Representative Longworth, R–Ohio); *Id.* App. 1398 (statement of Representative Keating, D–Colorado). Senator Penrose (R–Pennsylvania), an opponent of the Revenue Act, spoke nonetheless of the need to prepare for "the invasion of importations which everyone confidently looks for as the war in Europe draws to a close." *Id.* 13061. The legislators' fears in this respect echoed those of the Secretary of Commerce in his 1915 Annual Report. *See* pp. 1219–1220, *supra. See also* 53 Cong.Rec.App. 1415 (1916) (statement of Representative Matthews, R–Ohio) (referring to the Secretary's report).

However, the 1916 Congress did not intend to retreat from the basic principle of

free trade embodied in the Underwood Tariff Act of 1913 and the Democratic Party platform of 1912. The Democratic Party platform in the reelection campaign of 1916 stated: [43]

We reaffirm our belief in the doctrine of a tariff for the purpose of providing sufficient revenue for the operation of the government economically administered, and unreservedly endorse the Underwood tariff law as truly exemplifying that doctrine.

During the debate on the Revenue Act, speakers from the Democratic majority uniformly congratulated themselves for the lowered tariffs, and attacked the Republicans for continuing to advocate protectionism. *E. g.*, 53 Cong.Rec. 10525 (statement of Representative McGillicuddy, D–Maine); *id.* 10596 (statement of Representative Dixon, D–Indiana); *id.* 13045 (statement of Senator Underwood, D–Alabama).

The House Committee on Ways and Means and the sponsor of the Revenue Act, Representative Kitchin, stated in unambiguous terms that the antidumping clause was intended to do no more than to impose on importers the same pricing restrictions which had already been imposed on domestic businesses. The committee report recommended adoption of the legislation in order that importers "may be placed in the *same* position as our manufacturers with reference to unfair competition." H.Rep. No. 922, *supra*, at 9 (emphasis added) (relevant portion quoted in full at p. 1221, *supra*). Representative Kitchin, explaining his bill at the outset of its consideration by the full House of Representatives, explained:

We believe that the *same* unfair competition law which now applies to the domestic trader should apply to the foreign import trader.

53 Cong.Rec.App. 1938 (1916) (emphasis added).[44] As Congress apparently was

---

43. Platforms, *supra* n.39, at 195.

44. The Wilson administration took the same position. The antidumping provision recommended by Secretary of Commerce Redfield

was conceived as "supplemental to the Clayton Antitrust Act" and was not intended to retard "that normal ebb and flow of legitimate commerce between our land and all others which will provide for our people the security against

aware, section 2 of the Clayton Act did not apply to international "dumping" transactions. *See Zenith, supra,* 402 F.Supp. at 248–49.

■ Our objective in construing the Antidumping Act of 1916 is to give effect to the intent of Congress. *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). Statements in a congressional committee report recommending adoption of legislation are highly authoritative in determining the purpose of that legislation. "A committee report represents the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Zuber v. Allen,* 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). *Accord, United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *United States v. Auto Workers,* 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957). The statements of the sponsor of legislation are also highly probative in its interpretation. *FEA v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976). "It is the sponsors that we look to when the meaning of the statutory words is in doubt." *National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 640, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357 (1967).

■ The principal lesson which we draw from the legislative history of the 1916 Act, viewed against the historical background of the first Wilson administra-

tion, is that the statute should be interpreted whenever possible to parallel the "unfair competition" law applicable to domestic commerce. Since the 1916 Antidumping Act is a price discrimination law, it should be read in tandem with the domestic price discrimination law, section 2 of the Clayton Act, which was amended by the Robinson-Patman Act in 1936.[44A] And, in order to be faithful to the intention of Congress to subject importers to "the same unfair competition law," we should not interpret the 1916 Act to impose on importers legal strictures which are more rigorous than those applied to domestic enterprises. We will be guided by these principles when we address the issues raised by the instant motions for summary judgment.

Before we turn to those issues, however, we must discuss the relationship between the Antidumping Act of 1916 and the Antidumping Act of 1921. Because the 1921 Act, as we have explained above, also plays an important role in this case, analysis of the 1916 Act and derivation of its meaning would not be complete without that discussion.

E. *Relationship Between the Antidumping Act of 1916 and the Antidumping Act of 1921*

In 1921, Congress enacted a law providing for the assessment of special antidumping duties on imported goods which are sold in the United States at a price lower than

---

exaction which is insured by reasonable competition: *See* pp. 1219–1220, *supra.* In a letter to the *New York Times* published on July 4, 1916, Assistant Attorney General Samuel J. Graham stated the administration's position on the pending antidumping provision:

Any anti-dumping provision is not a matter of taxation, or, strictly speaking, tariff. It is a power exercised under the commerce clause of the constitution and not under the taxing clause. Its purpose should be to prevent unfair competition. *Just as we have said to our own people by the Clayton Act that they should not indulge in unfair competition, so we propose to say the same to the foreigner.*

*Quoted in* J. Viner, *supra* n. 1, at 243 n. 1.

**44A.** The references in the legislative history to "the same unfair competition law" do not spec-

ify the Clayton Act, and could be read to refer to the Sherman Act instead. However, the Sherman Act is not concerned primarily with price discrimination, although pricing behavior may be relevant to its prohibitions of combinations in restraint of trade and of attempted or actual monopolization. Since the 1916 Act is a price discrimination law, it makes more sense to infer that Representative Kitchin and the House Ways and Means Committee were referring to § 2 of the Clayton Act, another price discrimination law, passed less than two years before, which is expressly limited in its scope to domestic transactions. Moreover, both Secretary of Commerce Redfield and Assistant Attorney General Graham viewed the proposed antidumping legislation as supplemental to the Clayton Act, not the Sherman Act. See pp. 1219–1220 & n. 44, *supra.*

their fair market value. The United States Treasury Department has made a finding of dumping under the 1921 Act with respect to television receivers imported from Japan, T.D. 71–76, 36 Fed.Reg. 4597, 5 Cust.Bull. 151 (1971), and has assessed antidumping duties against many of the companies which are defendants here, as well as other importers of television receivers. The plaintiffs seek to introduce evidence of these assessments at trial.

The Antidumping Act of 1921 was recently repealed as part of the Trade Agreements Act of 1979, Pub.L. No. 96–39, § 106, 93 Stat. 193 (effective Jan. 1, 1980). However, the 1979 Act includes a new antidumping law, 19 U.S.C.A. §§ 1673–1673i (1980), which is built on the 1921 Act, S.Rep. No. 96–249, 96th Cong., 1st Sess. 15–16 (1979), U.S.Code Cong. & Admin. News 1979, p. 381, and in large measure retains the substantive law of the 1921 Act, 45 Fed.Reg. 8182 (Feb. 6, 1980) (preamble to regulations implementing 1979 Act). Findings of dumping made under the 1921 Act remain in effect under the 1979 Act, § 106, 93 Stat. 193. Although the 1921 Antidumping Act is no longer in effect, we shall describe it and its legislative history briefly here in order to clarify the distinction between the instant litigation under the 1916 Antidumping Act and the administrative proceedings under the 1921 Act, and to complete the historical background of the 1916 Antidumping Act.

The Antidumping Act of 1921, 19 U.S.C. §§ 160–171 (repealed), does not include criminal penalties for dumping, nor does it create a private right of action for treble damages. It provides only for the assessment of a special dumping duty on merchandise as to which a finding of dumping has been made. *Id.* § 161. A finding of dumping has two components: a determination by the Secretary of the Treasury that a class or kind of merchandise is sold in the United States at less than its fair value, and a finding by the International Trade Commission that a domestic industry is injured or is likely to be injured as a result. *Id.* § 160(a). The amount of the special duty is the difference between the price in the United States and the "foreign market value" or the "constructed value." *Id.* § 161.

The genesis of the Antidumping Act of 1921 was a report of the United States Tariff Commission which concluded that the Antidumping Act of 1916 had not been effective in deterring dumping. Third Annual Report of the United States Tariff Commission (1919), *quoted in part in* H.R. Rep. No. 479, 66th Cong., 2d Sess. 2 (1919). H.R. 10918, 66th Cong., 2d Sess., a bill providing for the assessment of antidumping duties, was passed by the House of Representatives in 1919 on a voice vote. 59 Cong. Rec. 351. Representative Kitchin, who had been the sponsor of the 1916 Act, supported the 1919 bill, and explained the perceived failings of the 1916 legislation:

> In the act of 1916 . . . we have as stringent and as drastic an antidumping proposition as is contained in this bill. . . . The Tariff Commission declare that it is not workable, for the reason that it is almost impossible to show the intent on the part of the importer to injure or destroy business in the United States by such importation and sale.
>
> That is the trouble with this antidumping act of 1916, which is now the law. You have to show the intent of the foreigner, the intent of the importer, to injure or destroy some particular industry in the United States. The business here might be injured, might be destroyed, by such importations and sales as effectively without such intent as with it.

59 Cong.Rec. 346 (1919). The Tariff Commission also identified several other problems in the administration of the 1916 Act. *See* H.R.Rep. No. 479, *supra.*

The 1919 bill was reported favorably by the Senate Finance Committee, S.Rep. No. 510, 66th Cong., 2d Sess. (1920), but never came to a vote on the floor of the Senate. In 1921, however, an antidumping provision modeled on the 1919 bill was introduced as part of the Emergency Tariff Act of 1921. *See* H.Rep. No. 1, 67th Cong., 1st Sess. 23 (1921); 61 Cong.Rec. 261 (1921) (statement

of Mr. Fordney) (1921 antidumping bill "follows closely" 1919 bill). After extensive amendment in the Senate and in Conference Committee, this provision became the Antidumping Act of 1921.

Thus the raison d'etre of the 1921 Antidumping Act was the perceived inadequacy of the 1916 Act to prevent international dumping. However, Congress chose not to amend the 1916 Act, but rather to enact an entirely new system for the assessment of special dumping duties. The particular language of the 1916 Act which concerns us in this opinion, "actual market value or wholesale price of such articles," is absent from the 1921 Act. Instead, as the preceding summary indicates, the domestic price is first compared with "fair value" as part of the initial determination of liability, and then is compared with the "foreign market value" or the "constructed value." The statute defines the latter two terms, id. §§ 164 & 165, and "fair value" is defined in customs regulations. 19 C.F.R. § 153.1 (1979). All three definitions permit the appraiser to make reference to "such or similar merchandise" sold in a foreign country.

The phrase "such or similar merchandise" is itself defined in a separate section of the Act, 19 U.S.C. § 170a(3). That definition grants to the Secretary of the Treasury or his delegate broad discretion to look to the value of merchandise used for like purposes which "may reasonably be compared" to the merchandise under consideration. Id. § 170a(3)(C). This is a much more expansive charter than that contained in the 1916 Act. If non-identical merchandise is the basis for the assessment of value, the Secretary is instructed to make "due allowance" for the differences. Id. § 161(b)(3). The definition of "such or similar merchandise"

and the "due allowance" provision were enacted in 1958 amendments to the Antidumping Act of 1921, 72 Stat. 583 & 586. The scope of application of the expanded definition is expressly limited to the 1921 Antidumping Act. 19 U.S.C. § 170a.[45]

The foregoing explication was necessary because, as we have noted, the plaintiffs seek to introduce into evidence the findings and assessments by the Treasury Department against various defendants for violation of the 1921 Act, asserting that they establish sales below Japanese fair market value; hence the low price export conspiracy. Plaintiffs also proffer defendants' alleged attempts to cover up the 1921 Act violations as evidence of their conspiratorial intent. A few words are thus in order about the implications of the 1921 Act assessments.

In assessing antidumping duties under the 1921 Act, the Treasury Department determined the "foreign market value" of television receivers sold in Japan on the basis of technical comparisons broadly similar to the comparisons which plaintiffs offer in this litigation.[46] When Congress enacted the 1958 amendment defining the phrase "such or similar merchandise" expansively for purposes of the 1921 Act, it did not amend the 1916 Act by making that definition applicable to the determination of "actual market value or wholesale price" under the 1916 Antidumping Act, although it might have done so. Since that provision of the 1921 Act, as amended in 1958, does not apply to the 1916 Act, private litigants under the 1916 Act are not clothed with the Treasury Department's broad discretion to consider sales of any merchandise which it deems reasonably comparable. Therefore, the fact that the Treasury Department has

45. The 1958 definition was modified by a 1975 amendment, the substance of which is irrelevant here. 88 Stat. 2048 (1975). The definition of "such or similar merchandise," as amended in 1975, was reenacted with only editorial changes in the antidumping provisions of the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 181 (1979), 19 U.S.C.A. § 1677(16) (1980).

46. The plaintiffs have submitted as an exhibit to their reply to the instant summary judgment motions a memorandum to his file written by Lou Balaban of the United States Customs Service, dated April 17, 1975, which summarizes the technical comparisons undertaken by the Customs Service. Exhibit 12, Vol. 5 of Appendix to Plaintiffs' Memorandum in Opposition to Motions for Summary Judgment of Defendants Mitsubishi Electric Corporation and Melco Sales, Inc. (filed Oct. 16, 1978).

made certain technical comparisons is of no significance for the dumping claims in the instant litigation. Nor is the fact that the Department has assessed dumping duties on the basis of those comparisons relevant to the 1916 Act claims. The 1916 Act clearly does not create a private right of action for violations of the 1921 Act. Instead, as we have previously concluded, the 1916 Act must be construed in light of its incorporation of the appraisement provisions of the Tariff Act of 1913 and of its purpose of extending to importers "the same unfair competition law" applicable to domestic commerce under the Clayton Act.

The question remains whether the Treasury Department's technical comparisons, and the findings and assessments made by the Treasury Department and the International Trade Commission with respect to dumping under the 1921 Act, are relevant to plaintiffs' claims under Sections 1 and 2 of the Sherman Act. We hasten to add, therefore, that we express no opinion as to whether or not any of the findings or comparisons made under the 1921 Act are admissible to support plaintiffs' Sherman Act case; nothing in this opinion involves consideration of the Sherman Act claims.

Against the background of the preceding many-faceted discussion of the text and history of the 1916 Act, we turn to the critical question of the degree of similarity which the Act requires for product comparisons.

## V. THE DEGREE OF SIMILARITY REQUIRED FOR PRODUCT COMPARISONS UNDER THE 1916 ANTIDUMPING ACT

### A. *Introduction*

■ In this part of the opinion, we draw upon the more general analysis of the 1916 Antidumping Act which we undertook in Part IV, and decide the specific questions of statutory construction which the parties have raised in their motions and in the responses thereto. Initially, we consider and reject defendants' principal argument: that because of the use of the phrase "such articles" in the text of the 1916 Act, we should impute to Congress a determination that the Act have no application unless identical goods are sold in the United States

and in the relevant foreign market, in this case Japan. We reject that argument for five distinct reasons, which are stated more fully *infra*: (1) Of the customs decisions upon which defendants rely, only one pre-dates the passage of the Act in 1916, and that decision does not support defendants' construction; (2) the defendants' construction departs from the ordinary meaning of the word "such;" (3) the interpretation of the word "such" adopted in the customs decisions upon which defendants rely is compelled by the disjunctive language of the statutes construed there, and no equivalent consideration supports the adoption of the same construction here; (4) defendants' construction would exempt from the reach of the 1916 Act transactions in non-identical goods which are within the scope of domestic price discrimination law, contrary to the intent of Congress; and (5) defendants' construction of the 1916 Act is inconsistent with the incorporation therein of the customs appraisement standards of contemporary law.

Since we reject the contention that only identical articles may be compared as the basis for a dumping claim under the 1916 Act, we address ourselves next to elucidating the precise degree of similarity which the Act requires. In determining how similar articles must be in order to be compared in litigation under the Antidumping Act of 1916, we have consulted two sources to guide our interpretation of the statute.

■ First, we have looked to the standard governing product comparisons under section 2 of the Clayton Act, as amended by the Robinson-Patman Act. As we found in examining the legislative history of the 1916 Antidumping Act, Congress intended the 1916 Act to extend to importers the same price discrimination law applicable to domestic commerce. The standard which applies under the Robinson-Patman Act is that products must be "of like grade and quality" to give rise to liability for price discrimination. As is explained *infra*, we find that the same standard of "like grade and quality" limited product comparisons under section 2 of the Clayton Act prior to

the Robinson-Patman amendments. Since the Clayton Act was passed in 1914, the same standard is applicable under the Antidumping Act of 1916.

Secondly, we have construed the 1916 Act in light of the incorporation therein of the appraisement provisions of ¶ R of the Tariff Act of 1913 through use of the language "actual market value or wholesale price." While the 1913 Tariff Act authorized customs appraisers to refer to sales of similar merchandise, the degree of similarity required was not formulated in any precise way until after passage of the Tariff Act of 1922. We view the decisions of the Court of Customs Appeals interpreting the term "similar" as used in § 402(b) of the 1922 Tariff Act as controlling in our interpretation of the 1913 Tariff Act, since the valuation provisions of the 1922 Tariff Act were intended to continue the valuation system of the 1913 Tariff Act, and there is no reason to believe that customs practice was changed in 1922.

The standards of similarity which we derive from these two sources are consistent with each other, at least as applied to the case at bar. The Robinson-Patman standard has been formulated in the following terms:

> [I]f there are substantial physical differences in products affecting consumer use, preference or marketability, such products are not of "like grade and quality" regardless of manufacturing costs.

*Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876 (S.D.N.Y.1968), *aff'd*, 405 F.2d 319 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). In an unpublished opinion, the U.S. Court of Appeals for the Third Circuit has adopted the *Checker Motors* formulation. *See* p. 1233, *infra*. The Tariff Act standard was stated by the Court of Customs Appeals as follows:

> [I]f goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially

the same uses, and are so used, ordinarily, they are similar.

*United States v. Irving Massin & Bros.*, 16 Ct.Cust.App. 19, 25 (1928). Although there are verbal differences between the two formulations, both focus on physical differences, commercial interchangeability, and consumer use. That focus is decisive for the present motions.

We first address defendants' "such articles" argument. Following that, we turn to explication of the "like grade and quality" standard, and thereafter to the standard of similarity under the Tariff Acts.

### B. *Applicability of the 1916 Act to Non-Identical Goods*

The defendants argue that the Antidumping Act of 1916 has no application here unless the goods sold in the United States and the goods sold in Japan are identical. Their argument is based on the use of the term "such articles" in the Act, which provides in pertinent part:

> It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold *such articles* within the United States at a price substantially less than the actual market value or wholesale price of *such articles*, at the time of exportation to the United States, in the principal markets of the country of their production . . . .

15 U.S.C. § 72 (emphasis added). The defendants contend that the second use of the phrase "such articles" in the above-quoted portion of the statute refers to articles sold in the foreign market, i.e. Japan, and limits the purview of the statute to sales in Japan of articles which are identical to those sold in the United States.[47] The plaintiffs reply that the phrase "such articles" has the same meaning in both places in which it appears in the quoted portion of the statute; that the phrase refers to the articles which are

---

47. The first use of "such articles" in the quoted portion of the statute plainly refers to the arti-

cles which are imported into the United States.

imported into the United States; and that the imported articles can have an "actual market value or wholesale price . . . ' at the time of exportation to the United States, in the principal markets of the country of their production" even though no identical articles are sold in the country of their production. We agree with plaintiffs on these points.

·The defendants have cited to us nothing in the legislative history of the Antidumping Act of 1916 which indicates that any member of Congress intended the word "such" to mean "identical" or, indeed, that any member of Congress gave any thought at all to the meaning of the word "such." Instead, they have referred us to a line of customs decisions construing the term "such" in the phrase "such or similar merchandise" or "such or similar imported merchandise" in customs appraisement statutes.

The earliest of these decisions, and the only one preceding the enactment of the Antidumping Act in 1916, is *Beer v. United States*, 1 Ct.Cust.App. 484 (1911). In *Beer*, the Court of Customs Appeals held that the word "such" in the phrase "such or similar merchandise," as employed in section 11 of the Customs Administrative Act of 1890, meant, "the precise importation as sold by the importer himself." *Id.* at 486–87. *Beer* does not support the defendants: it implies that "such articles" means the very articles imported into the United States, while the defendants' position is that "such articles" refers not to the imported articles, but to other articles sold in Japan which are identical to them. Instead of supporting the defendants, *Beer* supports the plaintiffs in their contention that the phrase "such articles" refers to the articles imported into the United States in both its uses in the 1916 Act.

Subsequent decisions of the Court of Customs Appeals appear superficially to be more favorable to the defendants' positions. In *United States v. Johnson Co.*, 9 Ct.Cust. App. 258, T.D. 38215 (1919), the court ruled that "the word 'such' means 'identical'," interpreting ¶ L of the Tariff Act of 1913. This interpretation was soon extended to

the same phrase where it occurred in section 402(b) of the Tariff Act of 1922, *United States v. Irving Massin & Bros.*, 16 Ct.Cust. App. 19, T.D. 42714 (1928); *United States v. Meadows Wye & Co., Inc.*, 15 Ct.Cust.App. 451, T.D. 42643 (1928), and apparently has been followed ever since. *See, e.g., E. J. Brach & Sons v. United States*, 317 F.Supp. 264, 269, 65 Cust.Ct. 718, R.D. 11721 (1970); *United States v. Ford Motor Company*, 46 Cust.Ct. 735, A.R.D. 124 (1961). Relying on this line of cases, the defendants would have us rule that the phrase "such articles" in its second appearance in the Antidumping Act of 1916 means "identical articles, but not the very articles imported." Their position is unacceptable for several reasons.

First, as we have noted, the only decision which predates passage of the 1916 Act is inconsistent with the defendants' contention. While subsequent judicial interpretations of related customs statutes may be helpful in the construction of the 1916 Antidumping Act in the appropriate circumstances, *see* pp. 1234–1238 *infra,* the logical link between the 1916 Act and the decisions cited by defendants is highly tenuous. We cannot impute to Congress an intention to adopt in 1916 a judicial construction which was first announced in 1919 (even if the 1919 decision were favorable to defendants, which in fact it is not).

▪ Second, the construction urged by defendants does not square with a fundamental canon of statutory construction: "unless otherwise defined words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). We cannot say that the ordinary meaning of the word "such" is, or was in 1916, as narrow or as precise as defendants urge. Indeed, the plaintiffs have produced copies of many dictionary definitions showing that the word "such" has now and had in 1916 numerous meanings and shades of meaning. While the "ordinary meaning" rule does not help us to select one construction out of the many definitions in common use in 1916, it cautions us not to impute a specialized meaning

to the word "such" except on the basis of a strong showing that Congress intended a specialized meaning.

Furthermore, the decisions cited by defendants all involve construction of the statutory phrase "such or similar merchandise" or "such or similar imported merchandise." As a result, the interpretation of "such" adopted in the customs cases is compelled by the disjunctive language of the statutes construed in those cases. A familiar maxim of statutory construction is that words in a statute should not be construed as mere excess verbiage. *E.g., Application of Barker*, 559 F.2d 588, 591–92, (Cust. & Pat.App.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *United States v. Johnson*, 462 F.2d 423, 428 (3d Cir. 1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973). For example, in *Irving Massin, supra*, the Court of Customs Appeals explained the reasons for its interpretation of the phrase "such or similar merchandise" by referring to this same principle:

> If the word "similar" means no more than the word "such," then there is no reason for it being used in the statute. To so construe it, is to lose sight entirely of the ordinary meaning of the word and to adopt a construction based upon the theory that Congress has employed useless and unnecessary language in drafting this act, which, under ordinary circumstances, we may not do. "Similar" merchandise must be construed as different from "such" merchandise in order to give this statute full effect.

16 Ct.Cust.App. at 24 (citation omitted). If the word "such" in the phrase "such or similar" were interpreted to mean anything other than "identical," the word "similar" would be mere surplusage. No equivalent consideration requires or supports the adoption of the same construction here.

Fourth, the legislative history of the 1916 Antidumping Act reveals that the Act was intended to apply to importers "the same unfair competition law" which controlled

the pricing decisions of domestic traders. Section 2 of the Clayton Act, the relevant law regulating domestic commerce, did not and does not have so limited a scope as to apply only to discrimination in price between purchasers of articles which are identical to each other. Instead, as is explained in greater detail *infra* at pp. 1231–1234, section 2 of the Clayton Act, as amended by the Robinson-Patman Act of 1936, prohibits discrimination in price between purchasers of articles of "like grade and quality." If we were to adopt the defendants' proposed reading of the 1916 Antidumping Act, we would be unfaithful to the clearly expressed intention of Congress that importers be subjected to the same pricing law applicable domestically, for the standard of comparability of goods would be narrower under the 1916 Act than under the Clayton Act.

Fifth and finally, the construction urged by the defendants is not consistent with the incorporation in the 1916 Act of the customs appraisement standards of contemporary law. Paragraph R of the Tariff Act of 1913 specifically endorses the appraisement of imported goods by reference to the value of goods sold abroad which are similar but not identical to the goods under appraisement. That paragraph provides, in pertinent part:

> That the words "value" or "actual market value," or "wholesale price," whenever used in this Act, or in any law relating to the appraisement of imported merchandise, shall be construed to be the actual market value or wholesale price of *such, or similar merchandise comparable in value therewith*, as defined in this act.

38 Stat. 189 (emphasis added).[48] In one of the customs decisions upon which the defendants principally rely, the Court of Customs Appeals held in unambiguous terms that the provision we have quoted "authorizes that in arriving [at a determination of actual market value] appraising officers may not only take into consideration sales of the very merchandise imported but sales of similar merchandise." *United States v. Johnson Co.*, 9 Ct.Cust.App. at 270, T.D. 38215 (1919).

48. For reasons stated at pp. 1215–1217, *supra*, "actual market value" under the 1916 Anti-

dumping Act must be construed to conform to the provisions of ¶ R of the 1913 Tariff Act.

The statutory provision merely codified the long-established practice whereby customs appraisers would advert to sales abroad of merchandise similar to that undergoing appraisement. The pertinent language of the 1913 Act was a reenactment of an identical provision in the Tariff Act of 1909, § 18, 36 Stat. 101. While the 1909 provision was the first specific statutory authorization for reference to "similar merchandise comparable in value" in customs appraisement, it codified prior practice. Earlier customs statutes had made it the duty of customs appraisers "by all reasonable ways and means . . . to ascertain, estimate, and appraise . . . the actual market value and wholesale price of the merchandise." *E. g.*, Customs Administrative Act of 1890, § 10, 26 Stat. 136. The Secretary of the Treasury interpreted the latter provision to require appraisers to look to the value of similar merchandise when necessary:

> Where no sales of identical merchandise are made in the country of production, either for consumption or for export, the market value of similar goods of other manufacturers actually sold should be ascertained and be taken into account.

Treas.Dec. 3222 (1877), reiterated in Treas. Dec. 5806 (1883). *See Erhardt v. Ballin,* 150 F. 529 (2d Cir. 1906); *1,209 Quarter Casks and 1,235 Octaves of Sherry Wine,* 2 Benedict 249, 280–81, 24 Fed.Cas. 398, 409 (S.D. N.Y.1868).

We thus are brought full circle, finding the true congruence between the customs appraisement standards of contemporary (1916) law and the notion of comparable non-identical articles. The defendants, arguing for their narrow construction of the term "such articles," have tried to treat these matters as discrete. They direct our attention only to the interpretation of the word "such" in decisions like *Johnson, supra,* while ignoring the context in which the word "such" received that narrow interpretation—a system of customs appraisement in which reference to the value of similar and comparable merchandise was specifically authorized by statute. Their approach does not comport with either logic or reality.

■ We interpret the phrase "such articles" in the 1916 Act to refer to the articles imported into the United States, and not to other articles sold in Japan which are identical to the imported articles. Our construction follows *Beer v. United States, supra,* the only relevant customs decision predating passage of the 1916 Act. Moreover, our construction conforms to the frequent use of the word "such" in statutes and other legal writing (as well as common usage) to refer back to what has already been stated. In the 1916 Act, the phrase "such articles" merely refers back to the initial use of the word "articles," and does not modify the meaning of the word "articles." In grammatical terms, the word "such" is here used as a pronoun, and not as an adjective.

The actual market value of the imported articles may be determined by reference to sales of similar articles in Japan, for the reasons stated above. The absence of the word "similar" from the text of the 1916 Antidumping Act is not material. By use of the term of art "actual market value," Congress incorporated into the 1916 Act a system of customs appraisement which specifically authorized appraisers to look to the value of goods which were similar but not identical to the goods being appraised. That practice was explicit in the customs statute which was in force in 1916, and had been the policy of the Treasury Department at least since 1877.

Although the foregoing analysis makes it clear that the "actual market value or wholesale price" of the imported articles may be determined by reference to *similar* articles sold in the country from which the articles are imported, our inquiry does not end here. The meaning of the word "similar" in the context of the appraisement of imported merchandise is itself far from pellucid. The remainder of this opinion is devoted mainly to ascertaining the degree of similarity required for product comparisons under the 1916 Antidumping Act, and

to applying the standard we formulate to the facts before us.[49]

## C. The Standard of "Like Grade and Quality" Under the Clayton Act and the Robinson-Patman Act

■ As we have repeatedly stated, the 1916 Antidumping Act was intended to subject importers to the same price discrimination law which applied to domestic commerce. The imposition of liability under the 1916 Act on the basis of product comparisons which could not be the basis for application of the domestic price discrimination law would subject importers to *more rigorous* legal strictures than those applicable to domestic business, since their pricing flexibility would be more limited than that of domestic businesses. Since we may not convert the 1916 Act into protectionist legislation contrary to the intent of Congress, see discussion *supra*, we must construe the 1916 Act to harmonize with domestic price discrimination law.

Since the 1916 Antidumping Act is a price discrimination law, we are also mindful of the Supreme Court's admonition against overbroad interpretations of the Robinson-Patman Act which "extend beyond the prohibitions of the Act and, in so doing, help give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation." *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 80, 99 S.Ct. 925, 933, 59 L.Ed.2d 153 (1979), *quoting Automatic Canteen Co. v. FTC*, 346 U.S. 61, 63, 73 S.Ct. 1017, 1019, 97 L.Ed. 1454 (1953). This warning is equally applicable to the 1916 Antidumping Act, another price discrimination law with the same potential for encouraging price rigidity of imported goods.[50]

When the Antidumping Act of 1916 was passed, price discrimination in domestic commerce was prohibited by section 2 of the Clayton Act, ch. 323, 38 Stat. 730 (1914), which subsequently was amended by the Robinson-Patman Act, ch. 592, 49 Stat. 1526 (1936) (codified at 15 U.S.C. § 13). Neither statute applies to international price discrimination, because they prohibit discrimination in price between different purchasers of commodities only if both commodities are "sold for use, consumption, or resale within the United States." 15 U.S.C. § 13(a); 38 Stat. 730. In an earlier decision in this case, Judge Higginbotham deter-

---

**49.** Although the plaintiffs' affiant and expert witnesses aver that U. S. and Japanese consumer electronic products are "comparable" and "similar," their opinions are not controlling. We cannot stop our inquiry here and rule that there is a genuine issue of fact as to the similarity of the products, without exploring the legal standard in greater depth. As we demonstrate in the text to follow, there are available sources of law which control the interpretation of the term "similar" in this litigation. One such source is the Clayton Act, as amended by the Robinson-Patman Act, which is considered at pp. 1231–1234, *infra*. The other source is customs appraisement law, which is considered at pp. 1234–1239, *infra*. As the court observed in *Nichols & Company v. United States*, 59 C.C.P.A. 67, 72, 454 F.2d 1183, 1187 (1972), "the word 'similar' has a very specific and slightly out of the ordinary meaning in customs law."

Given the more precise legal standard governing the comparability of products, which is derived from these two sources of law, we shall hold that the issues of fact as to the technical comparability of U. S. and Japanese consumer electronic products, while genuine, are not material. Although plaintiffs' affiant and witnesses characterize the technical differences be- tween U. S. and Japanese products as minor or insignificant, the legal significance of those differences is an issue of law to be decided by the court. Legal conclusions stated in an affidavit or an expert witness report do not raise an issue of material fact so as to preclude the grant of summary judgment.

**50.** The Justice Department has trenchantly criticized the economic impact of the Robinson-Patman Act. United States Department of Justice, Report on the Robinson-Patman Act (1977). Without expressing any opinion on the economic arguments of the Justice Department report, we note our concurrence with the Department's observation that the use of the word "discrimination" to describe the behavior forbidden by the Robinson-Patman Act and by the 1916 Antidumping Act carries with it no undertones of moral condemnation:

The word 'discrimination' has a pejorative connotation derived from its use in other contexts, e. g. racial or religious discrimination. A proper understanding of its use in economic terms requires a conscious effort to disassociate the word's social meanings.

*Id.* at 4 n. 4.

mined that the Clayton Act, as amended by the Robinson-Patman Act, does not reach price discriminations between different national markets. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 244 (E.D.Pa.1975).

Under section 2 of the Clayton Act, it was an affirmative defense that price differences were "on account of differences in the grade [or] quality" of the commodities sold.[51] In *Boss Manufacturing Co. v. Payne Glove Co.*, 71 F.2d 768 (8th Cir.), *cert. denied*, 293 U.S. 590, 55 S.Ct. 104, 79 L.Ed. 684 (1934), the earliest decision interpreting the words "grade" and "quality" in section 2, the court of appeals looked to "the physical facts," rejecting opinion testimony that there were no differences between the two lines of products under comparison.[52] The court concluded that certain cotton flannel gloves and mittens that were similar in construction and appearance to other products sold by the defendants, but of a cheaper grade of material and made by less expert workmen, were not of the same "grade and quality" sufficient to invoke section 2 of the Clayton Act. By focusing on the physical differences between the two lines of gloves and mittens, the court of appeals implicitly rejected the view that the products were comparable because they were within the same common-sense generic categories of "gloves" and "mittens," or were functionally equivalent.

In 1936, the Robinson-Patman amendments shifted the burden to the plaintiff to show that a supplier's products involved in

the price differentiation are of "like grade and quality." However, there is no indication in the legislative history that the 1936 Congress intended to alter the substantive meaning of the terms "grade" and "quality" as used in the Clayton Act. *See* F. Rowe, Price Discrimination Under the Robinson-Patman Act 64–65 (1962); Report of the Attorney General's National Committee to Study the Antitrust Laws 157 (1955). Nor have we found any such indication in subsequent case law.[53]

■ Since the standard of "like grade and quality" governs product comparisons under the price discrimination laws applicable to domestic sellers since 1914, and since the Antidumping Act of 1916 was intended to apply the same law to importers, we hold that any reference to sales in a foreign country for the purpose of establishing a claim of international price discrimination under the Antidumping Act of 1916 must be limited to sales of articles which are "of like grade and quality" to the articles sold in the United States, as that term is employed in the Robinson-Patman Act. Put differently, we hold that although the "actual market value or wholesale price" of imported articles in a foreign country may be determined by reference to sales of similar merchandise in the foreign country, the similar merchandise sold in the foreign country must be of "like grade and quality" to the articles sold in the United States, as the latter term is employed in the Robinson-Patman Act. Any other interpretation of the 1916 Act

---

**51.** 38 Stat. 730. *See* n. 32, *supra* (quoting section 2 of the Clayton Act in full).

**52.** 71 F.2d at 771. The opinion cited was written by Judge Wyman. Judge Sanborn concurred, stating, "I agree that the evidence was insufficient to justify the conclusion that there was no difference between the special gloves and the regular gloves offered by defendant to the trade . . . .," but finding other grounds dispositive. The third member of the panel, Judge Stone, dissented.

**53.** As the Supreme Court has observed, "the legislative history of these amendments leaves no doubt that Congress was intent upon strengthening the Clayton Act provisions, not weakening them." *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 544, 80 S.Ct. 1267, 1271–

1272, 4 L.Ed.2d 1385 (1960). Thus if any change were intended by Congress in altering the verbal formulation of the "grade" and "quality" provisions, the change must have been in the direction of expanding the coverage of the Act. In other words, the "like grade and quality" provision of the Robinson-Patman Act must adopt either the same standard as the corresponding provision of the Clayton Act, or a less exacting standard which broadened the coverage of the Act. If the moving parties can show that the products are insufficiently similar to meet the standard of "like grade and quality," then *a fortiori* the products are insufficiently similar to meet the equally or more exacting standard of the pre-1936 Clayton Act.

would not be consistent with the clearly expressed intent of Congress.

The standard governing product comparisons under domestic U. S. price discrimination law was stated succinctly by Judge Mansfield in *Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876, 889 (S.D.N.Y.1968), *aff'd*, 405 F.2d 319 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969): "[I]f there are substantial physical differences in products affecting consumer use, preference or marketability, such products are not of 'like grade and quality' regardless of manufacturing costs." [54] An illustrative application of this standard is the decision of the Federal Trade Commission in *Universal-Rundle Corp.*, 65 F.T.C. 924 (1964), *order set aside on other grounds*, 352 F.2d 831 (7th Cir. 1965), *rev'd*, 387 U.S. 244, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967). In that decision, the Commission ruled that two lines of bathroom fixtures manufactured by the respondent were not of like grade and quality even though they were made from the same raw materials by means of the same manufacturing operations. The Commission held that slight differences in the dimensions and water level of two bathtubs, and the use of built-in soap dishes in one tub but not the other, which differences affected the marketability of the bathtubs and were not artificial or fanciful, rendered the bathtubs not of like grade and quality, and precluded application of the Robinson-Patman Act.[55]

In an unpublished opinion, the U. S. Court of Appeals for the Third Circuit has adopted the standard of "like grade and quality" stated by Judge Mansfield in *Checker Motors, supra. Willow Run Garden Shop, Inc. v. Mr. Christmas, Inc.*, No. 73–2101, slip op. at 4 (August 5, 1974) (dis-

position noted at 500 F.2d 1401 [3d Cir.]), *rev'g* 1973–2 Trade Cases ¶ 74,816 (D.N.J. 1973). The district court in *Willow Run* had granted summary judgment for the defendants in a suit alleging violation of the Robinson-Patman Act. The district court ruled that there were no genuine issues of material fact, and found that Christmas trees and related products sold by the defendant to two different purchasers at different prices were not of "like grade and quality." The court of appeals reversed the grant of summary judgment. The appellate court observed that there were conflicting affidavits in the record as to the effect of the differences between the products sold to the two purchasers upon consumer use, preference or marketability, and held that there was a genuine issue of material fact which barred the grant of summary judgment on the "like grade and quality" issue. After discussing the conflicting affidavits, the court of appeals stated:

> Whether the differences between the various items in each category are minor and insubstantial, as claimed by Willow, or *material enough to affect consumer use, preference, or marketability*, present questions which cannot properly be resolved upon a motion for summary judgment. *See Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876, 889 (S.D.N.Y.1968), *aff'd*, 405 F.2d 319 [2d Cir.], *cert. denied*, 394 U.S. 999 [, 89 S.Ct. 1595, 22 L.Ed.2d 777].

Slip op. at 4 (emphasis added).

The other courts and secondary authorities which have interpreted the statutory phrase "like grade and quality" have followed the same approach as that adopted in *Checker Motors, supra*, and *Universal-Run-*

---

**54.** In *Checker Motors*, the plaintiff claimed that Chrysler sold automobiles for use as taxicabs at a lower price than it sold similar automobiles for use as private passenger cars, in violation of the Robinson-Patman Act. The defendant moved for summary judgment, arguing that its taxicabs and its private cars were not "of like grade and quality." The court stated the standard by which "like grade and quality" would be determined, and denied summary judgment

on that issue because there was a genuine issue of material fact as to whether or not the differences between Chrysler's taxicabs and its passenger cars were "substantial enough to affect consumer use, preference or marketability." 283 F.Supp. at 889.

**55.** 65 F.T.C. at 953–55. *See also id.* at 939–45 (Initial Decision with extensive discussion of relevant law).

*dle, supra*, although the verbal formulation of the relevant factors sometimes differs slightly from the one we have quoted. For example, in *Atalanta Trading Corp. v. FTC*, 258 F.2d 365, 369–71 (2d Cir. 1958), the Second Circuit applied the "like grade and quality" test in the interpretation of section 2(d) of the Clayton Act, as amended by the Robinson-Patman Act, and concluded that various pork products were not of like grade and quality despite their common source. In *Central Ice Cream Co. v. Golden Rod Ice Cream Co.*, 184 F.Supp. 312, 319 (N.D.Ill.1960), *aff'd*, 287 F.2d 265 (7th Cir.), *cert. denied*, 368 U.S. 829, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961), the court held that two types of ice cream, one of which was richer in butter fat than the other, were not of like grade and quality. And in *Pacific Engineering & Production Co. v. Kerr-McGee Corp.*, 1974 Trade Cases ¶ 75,054 at pp. 96,-742–44 (D.Utah 1974), *rev'd on other grounds*, 551 F.2d 790 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977), the court found that different mixtures of rocket fuel which were identical in functional customer usage *were* of like grade and quality. *See also Quaker Oats Co.*, 66 F.T.C. 1131 (1964); American Bar Association, Antitrust Law Developments 115 (1975); F. Rowe, Price Discrimination Under the Robinson-Patman Act 69 (1962); Report of the Attorney General's National Committee to Study the Antitrust Laws 158 (1955).

In a subsequent part of this opinion, we will apply the Robinson-Patman standard to the facts before us. First, however, we turn to an examination of the degree of similarity required to make two articles "similar merchandise" under the Tariff Act of 1913. That inquiry uncovers a standard of similarity which is analogous to the Robinson-Patman standard, and constitutes an alternate holding supporting our disposition of the summary judgment motions.

D. *The Standard of Similarity Under the Tariff Acts*

In Part IV, *supra*, we ruled that the phrase "actual market value or wholesale price" in the Antidumping Act of 1916 was drawn from the Tariff Act of 1913. Following the principle stated in *Lorillard v. Pons, supra*, we found that Congress intended the phrase to have the same meaning in the 1916 Antidumping Act as it had in the 1913 Tariff Act. In Part V–B, *supra*, we found that the Tariff Act and customs practice permitted appraisers to look to "similar merchandise comparable in value" in order to determine the "actual market value" of the imported merchandise. We are now concerned with the construction of the Tariff Act of 1913, as implicitly incorporated by reference in the Antidumping Act of 1916, in order to determine what degree of similarity is required. As the Court of Customs and Patent Appeals has recently stated, "the word 'similar' has a very specific and slightly out of the ordinary meaning in this context in customs law." *Nichols & Co. v. United States*, 59 C.C.P.A. 67, 454 F.2d 1183, 1187 (1972).

There are no reported judicial decisions construing the phrase "similar merchandise comparable in value" in ¶ R of the Tariff Act of 1913. The reason is simple: by statute, the decisions of appraisers were not subject to judicial review, in the absence of fraud or of jurisdictional defects. Tariff Act of 1913, ¶ M, 38 Stat. 187; Customs Administrative Act of 1890, § 13, 26 Stat. 137. *See Muser v. Magone*, 155 U.S. 240, 15 S.Ct. 77, 39 L.Ed. 135 (1894); *Beer v. United States, supra*. In 1922, Congress for the first time made appraisement decisions appealable to the Court of Customs Appeals on questions of law. Tariff Act of 1922, § 501, 42 Stat. 966.

Although appraisement decisions were not reviewable in court before 1922, they were subject to administrative review before the Board of General Appraisers. Appraisements could be appealed in a two-step process: first, to a single member of the Board of General Appraisers, and then to a panel of three members, sitting as an administrative court of last resort on appraisement matters. Tariff Act of 1913, ¶ M, *supra*; Customs Administrative Act of 1890, § 13, *supra*.

There are apparently only two reported decisions of the Board of General Apprais-

ers which involve interpretation of the phrase "similar merchandise comparable in value therewith" in ¶ R of the Tariff Act of 1913. Both decisions are reproduced in full in footnotes 57 and 58 *infra*.[56] In the first, the General Appraiser ruled that photographic dry plates sold in England were similar to plates imported into the United States. The only difference between the plates which is mentioned in the General Appraiser's opinion is their size. The General Appraiser commented that to hold ¶ R inapplicable whenever "merchandise in every minor detail the same as that the subject of appraisement" has not been sold "would be simply to create chaos in the work of appraising officers."[57] In the second decision, the General Appraiser decided that glass chimneys for street lamps which were straight were similar to glass chimneys which were made with a bulge. The General Appraiser found that "there is practically the same amount of glass, the same amount of workmanship, and the same price for the straight as for the bulged glass."[58]

**56.** Some decisions of the General Appraisers were published in the reports of Treasury Decisions; others were published only in reports called Reappraisement Circulars, and are cited as "C.R. _____," an abbreviation which may stand for "Circular Reappraisement." The decisions reproduced at n. 57 & n. 58, *infra*, are in the latter group. We thank Ms. Margaret Evans, Librarian of the United States Customs Court, for making copies of these decisions available to us.

**57.** McClelland, G. A.—Decided January 28, 1921.—Opinion.—

The Merchandise which is the subject of this appeal consists of photographic dry plates 3¼ by 4 inches, imported from London and invoiced at ⅖ per dozen, less 40 per cent discount. The appraiser advanced them to 3/-per dozen, allowing the same discount. The importing company seeks to maintain the invoice value upon the theory that while similar photographic dry plates are manufactured and sold in England for home consumption this particular size is manufactured expressly for export, and that by reason of such fact the market value ought to be found under the last provision of paragraph L of the tariff act of 1913 based upon the selling price of such plates in the United States, due allowance by deduction being made for estimated duties, etc., as therein provided.

From the evidence submitted I do not believe that this contention is tenable. It is shown that similar plates are manufactured by several English concerns and sold for home consumption in England, and the price lists of several of these manufacturing concerns are in evidence. In all of these price lists the per se prices are the same, but they show varying discounts. The plates of the various manufacturers, including those covered by this importation, differ only as to size. The list price of the size 3½ by 3½ inches, equalling 12¼ square inches, is listed at 3/–, while the size 3¼ by 4¼, equalling 13¹³/₁₆ square inches, is listed at ⅗. The plates in question, equaling 13 square inches,

are invoiced at 6d. per dozen less than the list price of 3½ by 3½ inches, and it would seem to follow that the market value should be at least what the smaller size plates were listed at.

Paragraph R of the tariff act of 1913, supra, provides—

That the words "value," or "actual market value," or "wholesale price," wherever used in this act, or in any law relating to the appraisement of imported merchandise, shall be construed to be the actual market value or wholesale price of such, *or similar merchandise comparable in value therewith*, as defined in this act.

I find from the evidence that plates similar to those under consideration are freely offered for sale in wholesale quantities in England, and that therefore, for the purpose of appraisement, in view of this provision in Paragraph R, resort may not be had to the provisions of paragraph L, supra. To hold that such recourse had to be taken in all cases where it could not be shown that merchandise in every minor detail the same as that the subject of appraisement had been sold in the principal markets of the country of exportation would be simply to create chaos in the work of appraising officers. The examiner was, it seems to me, not only liberal in the finding of the per se value but was equally liberal in the allowance of discount, and I therefore affirm his action.

Photographic Dry Plates, C.R. 30586, aff'd mem., C.R. 30870 (1921).

**58.** Decided November 2, 1921.

Sullivan, G. A.—Opinion.—The merchandise under consideration consists of lamp chimneys purchased in Germany, the entered value being marks 12.30 per dozen, and the purchase price being marks 18.64 per dozen. They were appraised at the purchase price. It appears this is the price required to be paid by exporters, and that the home price for use in Germany is marks 12.30 per dozen.

These administrative decisions are not particularly helpful. They indicate that "similar merchandise" need not be the same as that under appraisement in every detail, but offer no guidance as to how much difference between articles is consistent with their being "similar."

> There may be some question as to whether or not the identical merchandise is sold for domestic use. It is unquestioned that similar or comparable merchandise is sold in Germany for domestic use, the only difference being that the merchandise under consideration consists of a street lamp chimney glass bulged, while the comparable merchandise consists of a street chimney lamp glass without the bulge. The latter is used in Germany; the former from a sale made to an American importer to be used in the city of Baltimore.
>
> It is clear from the testimony there is practically the same amount of glass, the same amount of workmanship, and the same price for the straight as for the bulged glass. That being the fact, the domestic price is what governs, and I sustain the entered value.
>
> These importations were made prior to the emergency tariff act of 1921.
>
> Blown Glass Chimneys, C.R. 31289, aff'd mem., C.R. 31459 (1921) & 31608 (1922).

**59.** Between 1913 and 1921, "actual market value" as defined in ¶ R of the 1913 Tariff Act was the principal valuation standard for imported merchandise. If "actual market value" under ¶ R could not be calculated, appraisement would be made on the basis of cost of production or of wholesale price in the United States, as provided in ¶ L of the 1913 Act. *See Goodyear Tire & Rubber Co. v. United States,* 11 Ct.Cust.App. 351 (1922). In the Emergency Tariff Act of 1921, Congress added a new standard for the appraisement of imported merchandise: export value, defined as follows:

> Sec. 302. That for the purposes of this title the export value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, less the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of

In the Tariff Act of 1922, Congress revised the statute governing customs appraisement. Section 402(b) of the Tariff Act of 1922 defined "foreign value," which corresponded to "actual market value" in the 1913 Tariff Act.[59] "Foreign value" was defined as "the market value or the price

> delivery in the United States, and plus, if not included in such price, the amount of any export tax imposed by the country of exportation on merchandise exported to the United States.

42 Stat. 15–16 (1921). The principal difference between this definition and the one in ¶ R of the 1913 Act, quoted in full at n. 36, *supra,* is that export value as defined in the 1921 Act is the price at which merchandise is offered for sale in the relevant foreign market "for exportation to the United States." The Supreme Court had ruled in *United States v. Passavant,* 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed. 644 (1898), that actual market value had reference to the price at which merchandise was offered for sale in the foreign market for home consumption in the foreign country, interpreting § 19 of the Customs Administrative Act of 1890. The same definition of actual market value was subsequently incorporated into ¶ R of the 1913 Tariff Act, *compare* 169 U.S. at 21–22, 18 S.Ct. at 222 *with* n. 36, *supra.* By 1921, because of the postwar currency inflation in Europe, the export value and the actual market value for home consumption of the same goods were often highly divergent. *See* R. Smith, Customs Valuation in the United States 138–39 (1948); B. Levett, Through the Customs Maze 37–38 (1923). Congress provided in § 303(a) of the Emergency Tariff Act of 1921 that thereafter all references to the value of imported merchandise should "be construed to refer . . . to actual market value as defined by the law in existence at the time of the enactment of this Act, or to export value as defined by section 302 of this Act, whichever is higher." 42 Stat. 16 (1921). The Antidumping Act of 1916 was excepted from the change in valuation made by § 303(a). *See* p. 1216, *supra.*

To summarize, immediately prior to the enactment of the Tariff Act of 1922, imported merchandise was appraised by the following hierarchy of appraisement standards:

> (1) The actual market value as defined in /R of the 1913 Act, or the export value as defined in § 302 of the 1921 Act, whichever was higher;
>
> (2) The cost of production, or the wholesale price in the United States, as defined in /L of the 1913 Act, if actual market value could not be ascertained.

In the Tariff Act of 1922, Congress continued the valuation system of existing law, with minor changes. H.R.Rep. No. 1223, 67th Cong., 2d Sess. 148 (1922) (quoted in the text follow-

. . . at which *such or similar merchandise* is freely offered for sale to all purchasers in the principal markets of the country from which exported . . . ." 42 Stat. 949 (emphasis added). The inclusion of the phrase "such or similar merchandise" in the 1922 Tariff Act was intended to continue unchanged, and not to alter, the power which customs appraisers had to consider "similar merchandise comparable in value therewith" under the 1913 Tariff Act. The legislative history of the 1922 Tariff Act reveals that Congress intended to continue the valuation system of existing law. The House managers in the conference committee explained the legislative history of the appraisement section of the 1922 tariff bill:

The House bill provided for the "American valuation plan". . . . The Senate amendment strikes out this provision in the House bill and substitutes, with minor changes, *the foreign valuation system of existing law.* . . . [T]he House recedes with an amendment making clerical changes.

H.R. Rep. No. 1223, 67th Cong., 2d Sess. 148 (1922) (emphasis added). *See* S. Rep. No. 595, 67th Cong., 2d Sess. 4–9 (1922); H.R. Rep. No. 248, 67th Cong., 1st Sess. 21–27 (1921).

Since Congress did not intend that the 1922 Tariff Act alter the 1913 Tariff Act with respect to appraisement by reference to sales of similar merchandise, we may consult the construction of the term "similar" in interpretations of § 402(b) of the

ing this footnote). However, Congress changed the name "actual market value" used in the 1913 Act to "foreign value," and shortened its definition somewhat. Section 402(a)–(c) of the Tariff Act of 1922 read as follows:

Sec. 402. VALUE.—(a) For the purposes of this Act, the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If neither the foreign value nor the export value can be ascertained to the satisfaction of the appraising officers, then the United States value;

(3) If neither the foreign value, the export value, nor the United States value can be ascertained to the satisfaction of the appraising officers, then the cost of production;

(4) If there be any similar competitive article manufactured or produced in the United States of a class or kind upon which the President has made public a finding as provided in subdivision (b) of section 315 of Title III of this Act, then the American selling price of such article.

(b) The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(c) The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise

to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. If in the ordinary course of trade imported merchandise is shipped to the United States to an agent of the seller, or to the seller's branch house, pursuant to an order or an agreement to purchase (whether placed or entered into in the United States or in the foreign country), for delivery to the purchaser in the United States, and if the title to such merchandise remains in the seller until such delivery, then such merchandise shall not be deemed to be freely offered for sale in the principal markets of the country from which exported for exportation to the United States, within the meaning of this subdivision.

42 Stat. 949 (1922). It is apparent both from *the place which* "foreign value" occupied in the overall valuation system established in § 402(a) and from the definition of "foreign value" in § 402(b) that despite minor changes in the definition, Congress intended "foreign value" to correspond to "actual market value" as defined in ¶ R of the 1913 Tariff Act, *see* n. 36, *supra.* Consequently we may consult the construction of the term "similar" in decisions interpreting § 402(b) of the Tariff Act of 1922 in order to determine the meaning of the word "similar" as used in the Tariff Act of 1913.

1922 Tariff Act to inform our analysis of the 1913 Tariff Act and, ultimately, of the 1916 Antidumping Act. In *United States v. Irving Massin & Bros., supra*, the Court of Customs Appeals announced the following rule to govern product comparisons under the 1922 Tariff Act:

> [I]f goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402(b).

16 Ct.Cust.App. at 25. In *United States v. Wecker & Co.*, 16 Ct.Cust.App. 220, 225 (1928), the court explained the applicable standard:

> The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use *and may be substituted therefor*, is available. Such an article is a similar article, notwithstanding the price, the methods of

construction, and the component materials may be somewhat different; but, *for all utilitarian purposes, one is a substitute for the other*. It is in this sense, we believe, that the word similar was used in said section 402(b).

(emphasis added). The same standard has been applied in customs appraisement cases since 1928 up to the present.[60] In *C. J. Tower & Sons v. United States*, 50 C.C.P.A. 76, 81 (1963), the Court of Customs and Patent Appeals stated that:

> the overriding consideration in determining similarity, be it merely similarity of materials or overall similarity of merchandise for appraisement purposes is *commercial interchangeability* rather than considerations of ultimate use or cost of production.

(emphasis in original). Two customs decisions from the 1960's are particularly pertinent here because they involve products which are functionally similar but are not commercially interchangeable because of different technical conventions which are followed in the United States and in a foreign country. In both cases, the courts ruled that the imported article and the article sold for use in the foreign country were *not* similar for customs appraisement purposes.

---

**60.** The valuation system in § 402 of the Tariff Act of 1930 was essentially the same as that in § 402 of the Tariff Act of 1922. *Compare* 46 Stat. 708 (1930) (codified with amendments at 19 U.S.C. § 1402) with 42 .Stat. 949 (1922) (quoted in pertinent part at n. 59, *supra*). In the Customs Simplification Act of 1956, Congress revised the valuation system, 70 Stat. 943 (1956) (codified at 19 U.S.C. § 1401a), while providing that the 1930 system should remain in effect with respect to certain imported articles. *See* 19 U.S.C. § 1402.

While the details of the appraisement provisions are not relevant here, what is relevant is that the appraisement statutes continued to refer to "such or similar merchandise," and the customs courts continued to interpret the word "similar" in that phrase by referring to the leading cases of *Irving Massin, supra*, and *Wecker, supra*, decided under the Tariff Act of 1922. For example, in *United States v. Eggen*, 55 C.C.P.A. 95, 100 (1968), the Court of Customs and Patent Appeals quoted the legal standard for determining similarity from *Massin* and also analyzed the *Wecker* decision. In *United States v. Ford Motor Co.*, 46 Cust.Ct.

735, 740, the court set forth the standard of similarity stated in *Massin*, quoting virtually identical language from a subsequent decision of the Court of Customs and Patent Appeals which adhered to the *Massin* rule. Since these decisions are applications of the *Massin* rule, which we have held should also be applied in the interpretation of the 1913 Tariff Act, and thereby to the interpretation of the 1916 Antidumping Act, we are justified in relying on *Eggen, supra*, and *Ford Motor, supra*, in the construction of the 1916 Act.

The Trade Agreements Act of 1979 includes both an antidumping provision which we have previously considered, p. 1223 & n. 45, *supra*, and a revision of the valuation system for imported goods. The new valuation law includes a statutory definition of "similar merchandise" which is essentially the same as the definition found in customs case law beginning with *Irving Massin, supra*, and *Wecker, supra*. The definition provides, *inter alia*, that "similar merchandise" must be "commercially interchangeable with the merchandise being appraised." Pub.L. No. 96–39, 93 Stat. 201 (1979), 19 U.S.C.A. § 1401a(h)(4) (1980).

In *United States v. Eggen*, 55 C.C.P.A. 95, C.A.D. 939 (1968), the Court of Customs and Patent Appeals held that metric size ball bearings sold in the West German market were not "similar" to inch size bearings that were exported to the United States because the products were neither commercially nor mechanically interchangeable, saying at page 101:

> [T]he evidence that the bearings are not *mechanically* or *commercially* *interchangeable* clearly amounts to substantial evidence to support the Appellate Term's conclusion of dissimilarity. . . .

(emphasis supplied).

Similarly, in *United States v. Ford Motor Co.*, 46 Cust.Ct. 735, A.R.D. 124 (1961), the Customs Court held that left-hand-drive automobiles made in Ireland for export to the United States were not "similar" to the right-hand-drive autos made there for home use. The Court said:

> We are in accord with the trial court that the evidence presented establishes that the NASS [left-hand-drive] vehicles are not similar to the cars produced for home consumption in Ireland. . . . One could not be economically converted into the other, nor are they commercially interchangeable.
>
> As was stated by the trial court, *it is well settled that, as a general rule, 'commercial interchangeability' is one of the essential features of similarity.* . . .
>
> Here, while the NASS [left-hand-drive] vehicles may be made of some of the same materials as the cars for Irish consumption, they are not commercially interchangeable, nor, because of different rules of the road and other legal requirements, are they adapted to the same use.

(emphasis added).

Like metric ball bearings and right-hand-drive automobiles, electronic products made for use in Japan are adapted to different technical conventions from those which are followed in the United States. Although the absence of commercial interchangeability of those products with their U. S. counterparts may be the result solely of those different conventions, the teaching of customs law is that "similarity" should still be determined by the test of commercial interchangeability. Thus even if all the differences between electronic products manufactured for use in Japan and electronic products manufactured for use in the United States are necessary to conform to the different technical requirements of broadcasting and electrical power distribution in the two countries, and even if there are no other differences between the products, still they are not similar under relevant law unless they are commercially interchangeable.

We now turn to the application of the two rules—the standard of like grade and quality under the Robinson-Patman Act and the standard of similarity under customs law—to the facts before us.

## VI. STANDARDS FOR SUMMARY JUDGMENT; APPLICATION OF THE LEGAL STANDARDS OF COMPARABILITY TO THE FACTS

Rule 56 of the Federal Rules of Civil Procedure permits the grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). The burden of demonstrating that there is no genuine issue of material fact rests on the moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment may not be granted if there is "the slightest doubt" about material facts. *Tomalewski v. State Farm Life Insurance Co.*, 494 F.2d 882, 884 (3d Cir. 1974).[61] Consequently, a motion for

---

61. The "slightest doubt" formulation of the evidentiary standard for summary judgment has been explicitly rejected by the Second Circuit. *Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir. 1972). The National Commission for the Review of Antitrust Laws and Procedures, appointed pursuant to Executive Order 12022 to make recommendations on "[r]evision of procedural and substantive rules of law needed to expedite the resolution of complex antitrust

summary judgment may not be granted on the ground that if a verdict were rendered for the adverse party the court would set it aside as against the weight of the evidence. *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363, 1366 (3d Cir. 1979), *quoting Rosenthal v. Rizzo*, 555 F.2d 390, 394 (3d Cir.) *cert. denied*, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977). Similarly, summary judgment is not appropriate if the resolution of a material issue of fact turns on the credibility of witnesses. *Poller v. Columbia Broadcasting System Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Remak v. Quinn*, 611 F.2d 36 (3d Cir. 1979). All inferences from the evidence must be drawn in favor of the party opposing the motions—here, the plaintiffs. *Small v. Seldows Stationery*, 617 F.2d 992 (3d Cir. 1980).

Although we recognize that the standards governing the grant of summary judgment are strict, we are convinced that those standards are met here. We have stated the material facts as to which there is no genuine issue in Part III, *supra*. As we noted there, the facts related are not subject to even the "slightest doubt" because they are admitted by the plaintiffs. Moreover, we have made no inferences from those facts to plaintiffs' detriment except those which are compelled by the rules of logic. A court is not required to suspend its ability to reason when considering a summary judgment motion, nor to draw inferences from the facts

of which they are not logically susceptible. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 287–89, 88 S.Ct. 1575, 1591–92, 20 L.Ed.2d 569 (1968); *Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244–45, (3d Cir., 1980).

We found in Part III that U. S. and Japanese television receivers are physically different in that they have different VHF and UHF tuners and different power transformers. As a result, TV receivers intended for use in Japan, if used in the United States, could receive only 4 VHF television channels and a limited number of UHF channels, and would be in serious danger of failing because of overheating. As a result of the physical differences between the two types of receivers it would, in the words of plaintiffs' expert and affiant, be "ridiculous" for a consumer in the United States to try to use a Japanese domestic TV receiver. We found that U. S. and Japanese TV receivers would differ markedly in consumer use, consumer preference, and marketability, since any rational consumer in the United States would prefer a receiver manufactured for use in the United States to one manufactured for use in Japan.[62]

Similarly, radios, phonographs, and tape and cassette recorders intended for use in Japan and in the United States are physically different in two respects. Except for battery-operated products, they have differ-

---

cases," criticized the "slightest doubt" formulation as "an unwarranted gloss on the 'genuine issue' requirement." National Commission for the Review of Antitrust Laws and Procedures, Report to the President and the Attorney General at 70, 80 F.R.D. 509, 566 (1979). However, the "slightest doubt" formulation has been adopted by the Third Circuit, *Tomalewski*, supra, 494 F.2d at 884, and by other circuits *see* Antitrust Commission Report at 79 n.44, 80 F.R.D. at 575, and is binding on this court, which must apply the law as stated by the U. S. Court of Appeals for the Third Circuit. Of course, in order to preclude the grant of summary judgment, any doubt must be based on "significant probative evidence" rather than mere allegations. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Tripoli Co. v. Wella Corp.*, 425 F.2d 932, 935–36 (3d Cir.) (en banc), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

**62.** The determination of the effects of the undisputed physical differences on consumer use, consumer preference, and marketability is necessarily hypothetical since it is undisputed that Japanese domestic electronic products have not been marketed in the United States. Our inference that the products are not usable to consumers or marketable in the country for which they were not designed is based on the rules of logic, *see First National Bank of Arizona, supra*, and on the characteristics of a hypothetical "rational" consumer. The use of the term "rational" here is not meant to refer to any economic theory of maximization of utility, but rather to the ordinary common-sense meaning of the word. For example, we deem it clear beyond peradventure that a rational consumer would prefer a TV set which receives all broadcasts to one that only receives broadcasts on a limited number of channels.

ent power supply components, or different alternating-current motors, or both; and radios which receive FM broadcasts have different FM tuners. As a result of these physical differences, non-television products designed for use in the United States which are not battery-operated would not operate satisfactorily if they were used in Japan. The audio output of all radios, phonographs, and tape and cassette recorders would include an objectionable hum, and the motors of phonographs and tape and cassette records would run at the wrong speed. In addition, radios which receive FM broadcasts would receive transmissions on only about a tenth of the FM band. We found in Part III that these physical differences in non-television products would affect consumer use, consumer preference, and marketability. The only exceptions to this finding were battery-operated electronic products which do not receive FM radio broadcasts.

We are mindful of the statements of plaintiffs' experts Brugliera, Horn, and Lukas that the physical differences between U. S. and Japanese products upon which we rely to grant summary judgment are insignificant from a technical or a cost standpoint. However, for reasons which we have stated at great length, the controlling legal standards are ones that speak in terms of consumer use, consumer preference, and marketability. They do not speak in terms of technical significance or cost factors. The determination of the *legal* significance of the undisputed physical differences is for the court, and not for plaintiffs' experts. Thus, although the statements of plaintiffs' experts as to the technical insignificance of those differences and the irrelevance of the differences to manufacturing costs are plainly sufficient to create a genuine issue of fact, it is an issue which is not material to the disposition of these motions.

█ For the reasons stated in Part III and briefly restated here, it is absolutely clear, *i. e.*, not subject to question, that with respect to nearly all categories of consumer electronic products, there are substantial physical differences between products man-

ufactured for use in Japan and those manufactured for use in the United States, and those differences render articles manufactured for use in each country unusable and unmarketable in the other. Consequently, with narrow exceptions, the products are not of like grade and quality.

It is equally clear that consumer electronic products manufactured for use in the two countries, with the same exceptions, are not commercially interchangeable and are not adapted to the same use. Consequently, with the same exceptions, the products are not similar under customs appraisement law. The *Eggen* decision, concerning metric ball bearings, and the *Ford Motor* decision, concerning right-hand-drive automobiles, are highly pertinent here, because in those cases the customs courts ruled that products which are designed to conform to the different technical conventions of the U. S. and other nations are not similar, within the meaning of customs appraisement law.

Since the products, with certain exceptions, meet neither of the tests which we have held must be applied to determine their comparability for purposes of the Antidumping Act of 1916, they are not comparable for purposes of that Act. To reiterate, the exceptions we have noted include only a small class of consumer electronic products. These are phonographs, tape and cassette recorders, and non-FM radios, and only products in those categories which are battery-operated. With respect to this class of products, the defendants have proffered no evidence to demonstrate that there is no genuine issue of fact material to their comparability under the 1916 Antidumping Act.

Except with respect to this narrow class of products, plaintiffs' claims under the 1916 Antidumping Act rests on the comparison of products sold in the United States and products sold in Japan, which products are not comparable under the 1916 Antidumping Act for the reasons which we have stated at great length. Accordingly, the defendants' motions for summary judgment will be granted with respect to all television receivers, all products which are not solely

battery-operated, and all products which receive FM radio transmissions. The motions will be denied with respect to all other products, a residual category which consists only of battery-operated consumer electronic products in the following three categories: phonographs, tape and cassette recorders, and radios which do not receive FM transmissions.

Since NUE's claims under the Antidumping Act of 1916 involve only television receivers, and we have held that U. S. and Japanese television receivers are not comparable under the 1916 Act, we will dismiss Count I of NUE's Complaint, which states its 1916 Act claims. The residual category of non-television products which are not affected by our order, described *supra*, is included within Zenith's claims under the 1916 Act claims. Because a portion of Zenith's claims survive our summary judgment order, we do not dismiss those counts of Zenith's Complaint and Counterclaim which state its dumping claims.[63]

We have reflected long and hard on the issues which have been resolved in this lengthy opinion. During those reflections, we have conjured the image of an American industrialist or labor union official or public official, concerned about the health of American industry, who possessed a TV set manufactured in Japan, and who had just returned from a trade mission to Tokyo where, in his hotel room, he had turned on a TV set made by the same manufacturer as his set at home, which had a similar cabinet and an equally clear and bright picture. That individual might well say, a la Gertrude Stein: a TV set is a TV set is a TV set. He or she might think that we should not construct a chain of analysis which ab-

solves the Japanese TV manufacturers, who have in the decades of the 1960's and '70's made such inroads into the U. S. market, from the asserted consequences thereof. We felt some initial discomfiture over this putative lay reaction, but the discomfiture quickly abated when we focused on three considerations, two of which have been advanced at length in this opinion. First, the 1916 Act is not a protectionist act, but an antitrust act, and the purpose of antitrust acts is to foster competition (albeit fair competition) for the benefit of the consumer. Second, we cannot rewrite an Act of Congress to achieve a result which some may think desirable. Third, the plaintiffs' conspiracy claims under the Sherman Act are bottomed on much the same factual ground as their claim under the 1916 Act. The plaintiffs are proceeding on the Sherman Act case and, if it survives the defendants' summary judgment motions addressed thereto, they will go to trial on the Sherman Act claims this fall.

This reaction is consistent with that of Judge Schwartz in *Pezetel.* He concluded that the 1916 Act did not cognize a claim where the goods were, in essence, specially manufactured for the American market (there being no golf courses in Poland and no golf carts sold there), even though the alleged consequences for the American manufacturer were the same as those alleged here.

An appropriate order follows. The order includes the statement necessary to certify it for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). We turn now to a discussion of the factors justifying an immediate appeal of this opinion and order.

---

**63.** We are uncertain whether or not there *are* any products in this residual category which Zenith has sought to compare for purposes of its dumping claims. The list of technical comparisons of non-television products which plaintiff provided in the FPS, v. 17 at 8151–64, describes the products very briefly, *e. g.*, "AM radio." This brief description is insufficient to enable us to determine whether a particular product is solely battery-operated and receives no FM radio transmissions, the two characteristics which together would protect the prod-

ucts from our summary judgment order. If there are no such products, then we have granted summary judgment for defendants on all of the plaintiffs' dumping claims. If the defendants can demonstrate that there are no products in this residual category, they may of course move for dismissal of Count VII of Zenith's Complaint and Count VI of Zenith's Counterclaim. We will take this matter up at our next regularly scheduled pretrial conference. *See* n. 28, *supra*.

## VII. CERTIFICATION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)

Under 28 U.S.C. § 1292(b), a district judge may certify an order for interlocutory appeal if 1) it involves a "controlling question of law;" 2) there is "substantial ground for difference of opinion" with respect to that question; and 3) immediate appeal "may materially advance the ultimate termination of the litigation." In a prior opinion in this litigation, we examined in some detail the recent case law in the Third Circuit interpreting § 1292(b). 478 F.Supp. 889, 942–46 (E.D.Pa.1979). We do not repeat that analysis there, but write briefly to explain why the accompanying order includes the statement necessary to certify it for immediate interlocutory appeal.[64]

▆▆▆▆ It is plain that the order involves a "controlling question of law." That phrase includes at least "every order which, if erroneous, would be reversible error on final appeal," as well as other questions which are sufficiently "serious to the conduct of the litigation." *Katz v. Carte Blanche Corp.*, 496 F.2d 747 (3d Cir.) (en banc), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). Our interpretation of the Antidumping Act of 1916 presents a pure question of law which plainly would constitute reversible error if it is, in fact, erroneous. It is therefore a controlling question of law under § 1292(b).

▆▆▆ There is a substantial ground for difference of opinion on the interpretation of the 1916 Antidumping Act. As we have noted, the few prior decisions construing that Act had no occasion to explore it in the depth which we have attempted to reach herein. Accordingly, this opinion and order not only involve an issue which is of first impression, but also involve an Act which, despite its venerable age (64 years), is virtually a *statute* of first impression. While we are confident that our analysis of the statute is correct, we are aware that our analysis is highly complex, and that the issues presented are novel. Moreover, we have engaged in the always difficult enterprise of construing a statute which is not clear on its face, a task compounded by the statute's vintage. These circumstances compel us to recognize that our decision might be erroneous, and that there is accordingly a substantial ground for difference of opinion within the meaning of § 1292(b).

▆▆▆ The final criterion of § 1292(b) is also satisfied here. An immediate appeal unquestionably will materially advance the ultimate termination of the litigation. The pricing behavior of the defendants and their intent is not only crucial to plaintiffs' claims under the 1916 Antidumping Act, it is also central to their antitrust claims under the Sherman Act, which have not been

---

**64.** Certification of an order for immediate interlocutory appeal under 28 U.S.C. § 1292(b) is accomplished by placing in the order itself a statement that the court is of the opinion that the order involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. This statement is prescribed by the language of § 1292(b).

Neither the plaintiffs nor the defendants have formally moved for certification of this opinion and order; obviously they could not since, as of this writing, they had not seen it. At a recent hearing, however, counsel for the parties, indicated in response to our inquiry that they would assuredly seek certification if the legal issue were decided adversely to their position. Pretrial Order No. 236 (transcript of pretrial conference of April 2, 1980). Subsequently,

however, plaintiffs' counsel informed us that plaintiffs would prefer to examine our opinion before deciding whether or not to seek § 1292(b) certification.

We have the authority to certify our order under § 1292(b) *sua sponte. See, e. g., Ettinger v. Central Penn National Bank*, 2 B.R. 385 (E.D. Pa.1979) (Bechtle, J.); *Bernstein v. Universal Pictures, Inc.*, 79 F.R.D. 59 (S.D.N.Y.1978); *In re United States Financial Securities Litigation*, 75 F.R.D. 702 (S.D.Cal.1977), *rev'd on other grounds*, 609 F.2d 411 (9th Cir. 1979). Because we are certain that the order should be certified, and in order to save the time that would be consumed by proceedings on a separate motion for certification, we have decided to include the certification in the order granting summary judgment. We are concerned over time because we wish to avoid slippage in the trial date. This case will be a decade old on December 21, 1980.

considered in this opinion. Accordingly, a great deal of information concerning defendants' prices and intentions will be presented to the finder of fact at the trial of this litigation, now scheduled to begin in October 1980, whether or not the Court of Appeals reviews the instant opinion and order in advance of the trial. If this opinion and order were not certified for interlocutory appeal, but were reversed after the conclusion of the trial, we would be required in a subsequent trial of the 1916 Act dumping claims to retry in essence the major portion of the Sherman Act case. Moreover, even trial of the portions of the case discrete to the dumping claim might take longer, if only because of the need for general jury orientation as to the background of the litigation. Since the anticipated length of trial is now estimated at 12 months, a retrial of a major portion of the litigation would be an enormous waste of the resources of the judicial system, as well as the parties, witnesses, lawyers, jury, and everyone else involved in the litigation.

For these reasons we not only certify the accompanying order for immediate interlocutory appeal, but also urge the Court of Appeals to grant the plaintiffs leave to appeal. The exercise of the Court of Appeals' discretion to permit appeal of a certified order is apparently governed in part by the uniqueness, exceptionality, or extraordinary importance of the question of law involved. 478 F.Supp. at 945–46. As we have noted, our decision to certify our order is prompted in large part by the exceptional novelty and complexity of the legal question here presented. Moreover, a prompt and authoritative disposition of the question is extremely important to the prudent management of the litigation.

In fact, the certification procedure of 28 U.S.C. § 1292(b) was intended specifically to expedite the disposition of "big" cases like M.D.L. 189. A committee of the Judicial Conference, which proposed the statute, stated that it "should and will be used only in exceptional cases where a decision of the appeal may avoid protracted and expensive litigation, as in antitrust and similar protracted cases." 1958 U.S.Code Cong. & Ad-

min.News, pp. 5255, 5260. The report of the House Judiciary Committee explicitly adopted the view of the Judicial Conference, and added:

> There should be some way, for example, in long-drawn-out cases such as antitrust and conspiracy cases, to dispose of vital questions which are raised in the trial without having to wait for the taking of testimony and the conclusion of trial before the questions can be finally determined on appeal.

H.Rep. No. 1667, 85th Cong., 2d Sess. 1–2 (1958). In *Milbert v. Bison Laboratories, Inc.*, 260 F.2d 431, 433–34 (3d Cir. 1958), Judge Maris, writing for the Court of Appeals sitting en banc, quoted a large portion of the House Judiciary Committee report, and held:

> It is quite apparent from the legislative history of the Act of September 2, 1958 that Congress intended that section 1292(b) should be sparingly applied. It is to be used only in exceptional cases where an intermediate appeal may avoid protracted and expensive litigation and is not intended to open the floodgates to a vast number of appeals from interlocutory orders in ordinary litigation.

*Id.* at 433. This is, of course, not "ordinary litigation."

In actual practice, the scope of application of § 1292(b) has not been restricted narrowly to "exceptional cases." *See* 16 C. Wright, Miller, Cooper, and Gressman, Federal Practice and Procedure § 3929 (1977); Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 Harv. L.Rev. 607 (1975). While the legislative history does not preclude the use of § 1292(b) procedures in other cases, it is clear that the statute was framed with special attention to the problems of protracted and expensive litigation, which seem to arise most frequently in big antitrust cases. Because Congress intended that §1292(b) procedures be used to expedite the resolution of cases like the one before us, and because of the extraordinary burden that the case has been on the litigants and this

court, we feel especially justified in invoking the aid of the Court of Appeals by certifying this opinion and order for interlocutory appeal.[65]

Third Circuit Rule 23 requires that we state the controlling question of law which is the basis of the certification of our order for interlocutory appeal, although the scope of review is within the discretion of the appellate court. *See* 478 F.Supp. at 946. We state the controlling question thus: Are consumer electronic products manufactured for use in the United States and those manufactured for use in Japan comparable in a proceeding under the Antidumping Act of 1916, 15 U.S.C. § 72, even though: (1) the products are adapted to the technical conventions of television and FM radio broadcasting, and of the transmission of electrical power, which differ as between the two countries; (2) accordingly, the products have different tuners, power transformers, and electric motors; and (3) as a result, the products differ in consumer use and marketability and are not commercially interchangeable?

### PRETRIAL ORDER NO. 237

AND NOW, this 14th day of April 1980, upon consideration of the foregoing Opinion, and of various defendants' motions for summary judgment on plaintiffs' claims under the Antidumping Act of 1916, 15 U.S.C. § 72, it is ORDERED as follows:

1. With respect to television receivers, defendants' motions are GRANTED.

2. With respect to all products which are not solely battery-operated, defendants' motions are GRANTED.

3. With respect to all products which receive FM radio transmissions, defendants' motions are GRANTED.

4. With respect to products which are not included in paragraphs 1, 2, or 3, defendants' motions are DENIED.

5. Count I of the Complaint of National Union Electric Corporation in Civil Action No. 74–3247 is DISMISSED.

6. We are of the opinion that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of the litigation. Accordingly, this order is certified to the court of appeals for review pursuant to 28 U.S.C. § 1292(b). The controlling question of law is as follows: Are consumer electronic products manufactured for use in the United States and those manufactured for use in Japan comparable in a proceeding under the Antidumping Act of 1916, 15 U.S.C. § 72, even though: (1) the products are adapted to the technical conventions of television and FM radio broadcasting, and of the transmission of electrical power, which differ as between the two countries; (2) accordingly, the products have different tuners, power transformers, and electric motors; and (3) as a result, the products differ in consumer use and marketability and are not commercially interchangeable?

---

**65.** That portion of our order which dismisses Count I of the NUE complaint in Civil Action No. 74–3247 might also be appealable as a final judgment under Federal Rule of Civil Procedure 54(b) if the requisites of that Rule are met. *See generally Curtiss-Wright Corp. v. General Electric Co.*, 597 F.2d 35 (3d Cir.) *rehearing en banc denied*, 599 F.2d 1259 (3d Cir. 1979), *cert. granted*, 444 U.S. 823, 100 S.Ct. 43, 62 L.Ed.2d 29 (1979); *Allis-Chalmers Corp. v. Philadelphia Electric Co.*, 521 F.2d 360 (3d Cir. 1975). Since we have determined that the order should be certified for interlocutory appeal under § 1292(b), we do not reach the issues related to certification under Rule 54(b) for appeal as a final judgment.